NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CLEMENT BROTHERS COMPANY, Inc.
and United Mine Workers of
America, Respondents.

No. 25319.

United States Court of Appeals
Fifth Circuit.

Feb.. 12, 1969.

Rehearing Denied July 17, 1969.

385

Marcel Mallet-Prevost, Asst. Gen. Counsel, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, John I. Taylor, Michael N. Sohn, Linda Sher, Attys., N. L. R. B., Washington, D. C., for petitioner.

Harry L. Griffin, Jr., Overton A. Currie, William T. Wood, Smith, Currie & Hancock, Atlanta, Ga., for Clement Brothers Co., Inc., Mark G. Kaplan, Boston, Mass., Angoff, Goldman, Manning & Pyle, Boston, Mass., for International Union of District 50, United Mine Workers of America.

Before WISDOM and AINSWORTH, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge:

The NLRB petitions for enforcement of its order, reported at 165 NLRB No. 87, issued against Clement Brothers Company, Inc. (Company) and International Union of District 50, United Mine Workers of America (District 50) on June 21, 1967. The Board found that the Company violated Sections 8(a) (1), (2) and (3) of the National Labor Relations Act[1] (the Act) by rendering unlawful assistance to District 50 during a membership campaign, by entering into a collective bargaining agreement with District 50 when that Union did not represent an uncoerced majority of the Company's employees, by coercively interrogating and threatening its employees about their activities on behalf of the International Union of Operating Engineers, Local 926 (Operating Engineers) and by discharging three employees because of their activities on behalf of the Operating Engineers. The Board also found that District 50 violated Section 8(b) (1) (A) of the Act by coercing the Company's employees to sign its authorization cards and by entering into a collective bargaining agreement with the Company at a time when it did not represent an uncoerced majority of the Company's employees.

The Company is a North Carolina prime contractor engaged in the construction of a dam under contract with the United States Army Corps of Engineers near Carters, Georgia. A pre-hire

---

1. 29 U.S.C. Secs. 151 et seq.

agreement, permissible in the construction industry by virtue of Section 8(f)(1) of the Act, was executed on March 18, 1965. The first employee hired was Charles Farthing, District 50's job steward. By May 24, 1965, the date the collective bargaining agreement was executed, District 50 had admittedly obtained authorization cards from a substantial majority of the Company's 97 employees.[2] The Board, however, overruling the Trial Examiner, found that this majority was coerced. It found further that there were nine instances of job steward Farthing coercing employees to join District 50, six of which occurred prior to the execution of the contract. The Board also found that there were eight instances of coercion by the Company to join District 50, only one of which occurred prior to May 24.

The Board issued a standard order requiring the Company to cease and desist from recognizing District 50 or continuing their collective bargaining relationship. Similarly, it ordered District 50 to discontinue its activities as collective bargaining representative pending an election. The election was held November 6, 1967. The Company's employees cast 66 votes for the Operating Engineers and 28 for District 50. Eleven ballots were challenged. Neither the Company nor District 50 filed objections to the conduct of the election, and the Operating Engineers were certified as the bargaining representative. Both District 50 and the Company vigorously contested the Board's finding that District 50 did not represent an uncoerced majority of the employees in the unit on May 24, 1965.

The principal dispute involves the following extract from the Board's order:

"The Trial Examiner treated the question of District 50's pre-contract majority as one which was susceptible to resolution by a simple mathematical formula; we conclude that the character of the coercion should be more realistically measured in terms of its pervasive effect. We had found that in the period beginning approximately 8 weeks prior to the signing of the contract, as the evidence affirmatively shows, at least 7 employees were coerced into joining the Union. The likelihood that the coercion took place before the contract was executed was substantially more widespread than appears from the foregoing is suggested by respondents' coercive tactics continuing after the contract was signed."

Respondents contend that the Board erred in deviating from a strict game of numbers and that, in any event, one of the numbers was wrong. Although the exact size of District 50's majority is not clear, it is not disputed that simply subtracting 7 from the total would not destroy it. Thus, were we to restrict the Board to a mathematical approach, it is clear that the conclusions that the Company violated Section 8(a) and that District 50 violated Section 8(b) (1)(A) could not be sustained.

■■ The issue seems to reduce to whether the Board should be permitted to treat the specific instances of coercion as circumstantial evidence as well as or instead of direct evidence on the coerced majority issue. It is the Board's primary responsibility to find the ultimate facts under the statute. Oil, Chemical & Atomic Workers, etc. v. NLRB, 124 U.S.App.D.C. 113, 362 F.2d 943 (1966). Other fact-finders in our legal system are permitted to draw inferences from circumstantial evidence; respondents have suggested no reason why the Board should be treated differently. Nor does there seem to be anything suspect about this particular kind

2. There is some testimony indicating that the Company was sent over 80 authorization cards of District 50 out of a total payroll of 97 employees. Respondents did not introduce evidence showing the exact numerical majority of District 50 members, because the general counsel stated that it did not contest that District 50 had an actual majority. The general counsel did not concede, of course, that District 50 had an uncoerced majority.

of circumstantial evidence. The Board inferred from 7 proven instances of coercion that other unproven instances had occurred. The Board might also have inferred that the coercion of the 7 had an indirect effect on others. It is true, of course, that in some circumstances courts exclude circumstantial evidence. For example, evidence of prior convictions is frequently excluded at a criminal trial. This is not because it is not probative, but rather because a jury may regard it as more probative than it is and because of the high standard of proof required to deprive a man of his liberty. Here, however, we are dealing with an expert fact-finder. If the ultimate fact is inferred, it "places no particular hardship on the employer or the union. It merely requires that recognition be withheld until the Board-conducted election results in majority selection of a representative." International Ladies Garment Workers Union v. NLRB, 366 U.S. 731, 739, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762. In a system of labor relations in which a majority may become the exclusive bargaining agent of all workers in a unit, adequate protection of the minority requires that we permit the Board to exercise its full statutory powers to insure that those majorities are not coerced.

Given that circumstantial evidence may be used, our only further function in a case such as this is to determine whether there was enough of it to justify the inference drawn, i. e., whether there was "substantial evidence" to support the finding of a violation. Dixie Bedding Mfg. Co. v. NLRB, 268 F.2d 901 (5th Cir. 1959).

■ One of the incidents of coercion relied upon as evidence is disputed. The dispute is over the only violation alleged against the Company prior to the May 24 agreement. It is admitted that a Company superintendent told an employee, whom he had known previously, that "the Company's got some kind of Union here so best just join it and don't ask any questions." The Board interpreted this as an implied threat that continued employment was conditional upon joining the Union. The Company maintains that it was merely friendly advice, protected by Section 8(c) of the Act.[3] We conclude that in the circumstances the Board was justified in treating the incident as coercive. The reference to a "Company Union," as commonly understood, goes considerably beyond a statement of the employer's rights under the Act, since Company Unions are illegal. Cf. Texas Industries, Inc. v. NLRB, 336 F.2d 128 (5th Cir. 1964).

■ The Company also disputes the Board's finding that it violated Section 8(a) (3) of the Act by discharging three employees because of their activities on behalf of the Operating Engineers. The only issue before us is whether there is substantial evidence on the record as a whole to establish a reasonable inference that the employees' discharge was a result of the employer's anti-union motivation. NLRB v. O. A. Fuller Super Markets, Inc., 374 F.2d 197 (5th Cir. 1967). Here, there is a pattern of anti-union conduct. There is evidence indicating that these employees had been involved in Union activity, and there is evidence that the employees had been warned about Union activity prior to their discharge. Although the evidence is occasionally conflicting and the Board just might have refused to draw the inference of anti-union motivation, they did draw it; and we are clear to the conclusion that it was supported by substantial evidence.

■ Finally, it should be noted that throughout the proceedings against them respondents have requested an opportunity to examine all prehearing statements taken by Board agents in the

3. 29 U.S.C. Sec. 158(c) provides:
"The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic or visual form, shall not consti-

tute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

# 1031

course of investigating the unfair labor practice charges. The Board made available the prehearing statements of witnesses,[4] but refused to disclose those of nonwitnesses. After the Board's initial refusal, the Company filed suit in the United States District Court for the Northern District of Georgia seeking the requested statements under the authority of Section 3 of the Public Information Act, 5 U.S.C. Sec. 552(a) (3).[5] The District Court ruled[6] against the Company on the basis that the requested statements were within the specific exemption to Section 3 provided for investigatory files compiled for law enforcement purposes.[7] Since that decision was not appealed, the correctness of that determination is not directly before us. However, respondents have continued to complain about the effect of the nondisclosure on the general fairness of the proceedings against them. We thus feel it appropriate to indicate that we fully concur in the opinion of the District Court and to indicate that we do not feel the respondents were unfairly prejudiced by the Board's refusal to disclose these statements. This Court has previously expressed its views on disclosure in this context:

"It would seem axiomatic that if an employee knows his statements to Board agents will be freely discoverable by his employer, he will be less candid in his disclosures. The employee will be understandably reluctant to reveal information prejudicial to his employer when the employer can easily find out that he has done so. * * * In order to assure vindication of employee rights under the Act, it is essential that the Board be

able to conduct effective investigations and secure supporting statements from employees. We feel that preserving the confidentiality of employee statements is conducive to this end." Texas Industries, Inc. v. NLRB, supra, 336 F.2d at 134.

The order of the Board, having been determined to be based on findings of fact supported by substantial evidence and on acceptable legal standards, is due to be

Enforced.

4. The Board concedes the respondents were entitled to these statements under their customary application of the Jencks Act, 18 U.S.C. Sec. 3500, to their proceedings.

5. Section 3 provides in pertinent part: "* * * each agency, on request for identifiable records made in accordance with published rules * * * shall make the records promptly available to any person."

6. Clement Bros. Co. v. NLRB, 282 F. Supp. 540 (N.D.Ga. Feb. 6, 1968).

7. 5 U.S.C. Sec. 552(b) (7) provides in pertinent part: (b) "This section does not apply to matters that are * * * (7) investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency."