**J. H. RUTTER REX MANUFACTURING COMPANY, INC., Petitioner-Cross Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.**

No. 71–3260.

United States Court of Appeals, Fifth Circuit.

Jan. 16, 1973.

Rehearing and Rehearing En Banc Denied March 12, 1973.

Daniel Lund, Henry J. Read, New Orleans, La., for petitioner.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., Stanley J. Brown, Atty., N. L. R. B., Charles M. Paschal, Director, Region 16, N. L. R. B., New Orleans, La., for respondent.

Before COLEMAN, GOLDBERG and GODBOLD, Circuit Judges.

GOLDBERG, Circuit Judge:

This case involves the propriety of a back-pay order issued by the N. L. R. B. against petitioner, J. H. Rutter Rex Manufacturing Company, Inc. The genesis of the back pay claim is the company's failure to reinstate various employees who had participated in an unfair labor practice strike in 1954. This is the fifth time this case has appeared before this Court and hopefully, it will be the last.[1]

The background chronology of this judicial marathon is as follows: In April, 1954, there was a strike at petitioner's plant that lasted for one year.[2] On February 13, 1956, the N.L.R.B. issued a decision holding that the company had violated §§ 8(a)(1) and 8(a)(5) of the N.L.R.A. and that therefore the strike had been an unfair labor practice strike. 115 N.L.R.B. 388. The Board's order of mandatory reinstatement of all the strikers was enforced by this court. N.L.R.B. v. J. H. Rutter Rex Mfg. Co., Inc., 5 Cir. 1957, 245 F.2d 594. Included in that order was a requirement that Rutter Rex make whole any striker for lost earnings resulting from the company's failure to offer reinstatement. *See* § 10(c) of the N.L.R.A., 29 U.S.C. § 160(c). Many of the strikers were denied timely reinstatement and to remedy this the Board undertook the preparation of a back-pay specification.

Four years later, in November, 1961, following a lengthy investigation, the Board issued the first back-pay specification and notice of hearing. The specification consisted of the back-pay claims of all strikers who had been denied reinstatement for any part of the period in question. An attempt by Rutter Rex to have the proceedings permanently enjoined because of the four year delay was denied by this court. N.L.R.B. v. J. H. Rutter Rex, 5 Cir. 1962, 305 F.2d 242. Extensive hearings were then held on the claims in the specification, and in June of 1964 the trial examiner issued his initial findings. Two years later, in June of 1966, the Board adopted most of the trial examiner's findings and issued its first supplemental decision and order of back-pay liability. 158 N.L.R.B. 1414.[3]

---

1. In 1968, the last time this case was here, Judge Coleman remarked: "After thirteen years let the books be closed on this controversy." 399 F.2d 356, 365. Four and one-half years later, we can only echo his words.

2. The facts surrounding the strike are succinctly set out in N.L.R.B. v. J. H. Rutter Rex, 1969, 396 U.S. 258, 259–260,

90 S.Ct. 417, 24 L.Ed.2d 405, 408. The Board proceedings are more fully discussed in N.L.R.B. v. J. H. Rutter Rex Co., Inc., 5 Cir. 1957, 245 F.2d 594.

3. In its order the Board specifically reserved the possibility of further back-pay being ordered for those claimants who had not been offered reinstatement by June, 1961, which was the terminal date for

This court, reviewing the Board's initial back-pay order, modified that order by terminating petitioner's back-pay liability as of July 30, 1959. N. L. R. B. v. J. H. Rutter Rex Mfg. Co., Inc., 5 Cir. 1968, 399 F.2d 356. The primary justification for the modification was that the prolonged delay of the Board in issuing the order prejudiced the company's ability to defend the claims and that equity therefore required that an appropriate limit be put on the liability. On appeal, the Supreme Court reversed this court's modification and held, in essence, that the claimants should not be penalized for the Board's delay. N. L. R. B. v. J. H. Rutter Rex Mfg. Co., Inc., 1969, 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405. In April, 1970, this court, on remand from the Supreme Court, issued its judgment enforcing the Board's original back-pay order.

Following entry of the final order in the above proceedings, which involved the first back-pay order [Rutter Rex I], the Board's Regional Director began preparation of a second back-pay specification for those claimants whose back-pay claims extended beyond June, 1961. The second back-pay specification and notice of hearing was issued on November 30, 1970. A hearing on the specification was held in February and March of 1971, and the trial examiner's decision issued in June, 1971. On November 5, 1971, the Board issued its order granting supplemental back-pay to 33 claimants who had not been offered reinstatement until after June, 1961. 194 N.L.R.B. No. 6 (1971). Six of the claims extended beyond 1963 and the remaining twenty-seven were for a period of only two years or less.[4]

On November 17, 1971, Rutter Rex filed a petition in this court for review of the Board's second supplemental back-pay order. On December 27, 1971, the Board filed a cross application for enforcement of its order. In seeking to have this court set aside the back-pay order for the post-1961 period, the company raises the following contentions of error: (1) The Board failed to consider its own delay in setting the second back-pay award; (2) the punitive nature of the hearing, particularly the

---

computing liability for the first back-pay specification.

"With respect to those employees whose backpay was still accruing, as found by the Trial Examiner in his Supplemental Decision, payment to them of the net amount found to be due and accruing constitutes satisfaction of [the Company's] obligation only up to June 24, 1961, which is the end of the period covered by the specification."

*Id.* at 1425. It is the back-pay for the period after June 24, 1961, that is the subject of the appeal *sub judice.*

4. The total back-pay awarded in the second order was $53,078 plus interest at 6% commencing June 2, 1964. The sums awarded to individual claimants were as follows:

| | |
|---|---|
| Victoria Allen | $2,543 |
| Sonora Barnes (Rochon) | 340 |
| Doris E. Bowles | 812 |
| Marguerite Bozonier | 1,601 |
| Miriam Cheri | 530 |
| Bessie Cooper (Lee) | 1,591 |
| Georgiana Davis (Deruisa) | 2,252 |
| Lenora Davis | 236 |
| Alice T. Denly (Gabriel) | 21 |
| Gloria Dixon | 191 |
| Minnie M. Fernandez | 2,185 |
| Ethel Mae Foreman (Askin) | 1,414 |
| Edna Francis | 1,161 |
| Jimmie Lou Green | 3,536 |
| Gustavia Haynes (Gale) | 4,530 |
| Victoria Henderson | 2,121 |
| Rose Marie Hicks | 1,778 |
| Louise Jackson (deceased) | 1,286 |
| Eunice Johnson | 2,772 |
| Lila Mae Landry (Coston) | 192 |
| Leonard Lewis | 386 |
| Bessie Montgomery | 393 |
| Adele Nash (Hall) | 1,532 |
| Desideria O'Campo | 766 |
| Yvonne Parnell (Charles) | 1,367 |
| Dorothy K. Reed | 962 |
| Adele L. Robertson | 1,181 |
| Rosalie Thornton | 807 |
| Marjorie Walker | 351 |
| Alma Wallace | 52 |
| Fannie M. Watford | 9,592 |
| Beatrice White (Lane) | 3,007 |
| Dorothy White (Learson) | 1,591 |

Board's refusal to produce various Board records, denied the company a fair hearing; and (3) the evidence failed to support the awards to many of the claimants. With the exception of the Board's failure to produce certain notes relating to the Watford claim, we reject each of the company's assertions.

## I. The Board's Delay

As it did in *Rutter Rex I*, the company is alleging that the Board's delay prejudiced its ability to defend and that, therefore, the delay should somehow allow it to escape its liability to the claimants. Specifically, the company claims that the Board erred in refusing to even consider the delay as a factor. In support of its argument, the company continually refers to Justice Marshall's words in *Rutter Rex I*, in which he said that the opinion was limited to the "circumstances of this case." 396 U.S. at 259, 90 S.Ct. 417. Therefore, the company argues, the delay should have been considered anew in the second back-pay proceeding. We reject the company's argument for two reasons.

■ First, there is no indication that the Board did not, in fact, consider the delay.[5] Indeed, there is ample evidence to the contrary. The trial examiner ordered the general counsel to explain the delay in issuing the second specification. Only after the examiner considered and accepted the explanation was the delay factor rejected.

■ Secondly, we explicitly find that the Board was correct in refusing to allow the administrative delay to prejudice the claimants. In *Rutter Rex I*, the Supreme Court rejected the identical claim on almost identical facts, stating:

"We do not mean that delay in the administrative process is other than deplorable. It is deplorable if, as the Court of Appeals thought, the compa-

ny was hampered in the presentation of its defenses to the back-pay specification by the delay. It is even more deplorable if, as seems clear, innocent employees had to live for some years on reduced incomes as a combined result of the delay and the company's illegal failure to reinstate them. It may be that the company could have, through the courts, compelled earlier Board action. But the Court of Appeals exceeded the narrow scope of review provided for the Board's remedial orders when it shifted the cost of the delay from the company to the employees in this case."

396 U.S. at 265–266, 90 S.Ct. at 421.

In this second back-pay order we find the case against allowing the delay factor to prejudice the claimants to be even stronger than in *Rutter Rex I*. Before commencing the second back-pay specification, the Board wisely waited until after the first back-pay order was approved by the courts. Had the Court of Appeals decision limiting back-pay liability to the pre-1959 period been accepted by the Supreme Court, *a fortiori*, a post-1961 back-pay specification would have been of dubious legality. We cannot fault the Board for waiting until after the first back-pay order was finalized before beginning the second specification. In addition, the company had been on notice from the time of the 1966 Board order that post-1961 back-pay remained to be computed.[6] The fact that the company did not offer reinstatement to some of the claimants until 1970 provides further justification for the Board's waiting until it did to begin second back-pay specification. As the Board points out, "If the Board had held the second hearing prior to the May, 1970 reinstatement of the last striker, yet a third hearing would have to have been held after their backpay periods had been tolled by offers of reinstatement."

5. The company points to one sentence in the Board's opinion, that, referring to whether the Board's delay should be a factor in reducing liability, stated "The

Supreme Court [in *Rutter Rex I*] has answered it adversely to the respondent."

6. *See* note 3, *supra*.

The delay that has taken place in the adjudication of these claims is most unfortunate. Some of the fault obviously lies with the sluggish internal operations of the Board. The company, however, in failing to reinstate as ordered by the Board and by appealing the initial order is also very much to blame. Certainly, it would be both unjust and inconsistent with the Supreme Court's decision in *Rutter Rex I* to require that the otherwise entitled claimants pay the price for the delay, which was in no way caused by them. We find that the Board was correct in rejecting this defense.

## II. Denial of a Fair Hearing

The primary focus of the company's claim that it was denied a full and fair hearing before the Board is the refusal of the Board to allow the company access to certain Board files that might have aided the company in impeaching some or all of the back-pay claimants. We discern three somewhat distinct objections made by the Company: (A) The general failure of the Board to follow its normal procedure of collecting statements from the back-pay claimants and later making them available to the employer; (B) The Board's overruling of a subpoena duces tecum by which the company sought access to the Board's investigative files, and the continued refusal of the general counsel to produce these files upon request; and (C) The Board's refusal to allow Witness Lacey, a former Board compliance officer, to refresh his recollection while testifying by referring to his own memoranda located in the Board files. With the exception of the third point, we find the company's arguments to be without legal merit.

### A. *Board Procedures as a Denial of a Fair Hearing.*

In its briefs and argument to this court, the company unleashes a broad based attack on the procedures followed in this case. It alleges, in substance, that the Board's goal was to inflict "a monetary penalty upon respondents in as high an amount as obtainable." Specifically, the company refers to the Board's refusal to follow the usual procedures of collecting statements from the claimants and making them available to the company for impeachment purposes. As support for the charge of unfairness, the company points to the fact that the ultimate award in the second back-pay order was almost unchanged from the back-pay specification originally prepared by the Regional Director. Since the specification contains, in effect, the gross claims, this indicates that the company's defense to the second back-pay order was, by and large, totally impotent.[7]

We begin by noting that it is not the proper role of this court to establish Board investigative or discovery procedures. Absent a showing of unfairness, we are not at liberty to pass legal judgment on their processes. *See* N. L. R. B. v. Vapor Blast Mfg. Co., 7 Cir. 1961, 287 F.2d 402, 407. If, on occasion in the past, the Board has chosen to collect certain information and provide various items from its records to employers, that is its prerogative and it might well be the better practice in many cases. Where the Board, however, chooses to forego collection of the formal statements and to resist production on grounds of certain, judicially approved privileges, as it did here, we cannot condemn the practice simply because the Board has used different procedures in the past. The Board's procedures are not that strait-jacketed.

In Brown v. Thompson, 5 Cir. 1970, 430 F.2d 1214, this court was faced with the contention of a wrongful death claimant that the government, by refusing to produce a police report involving the investigation of the deceased's death, had made it impossible

---

7. In the first back-pay order, the company waged a vigorous defense against the back-pay claims with the result being that only $119,790 was *awarded*. The amount *claimed* in the first back-pay specification was $342,000.

for plaintiff to succeed. Upholding the district court's refusal to require disclosure, we said:

"Government documents are the outstanding example of matter which is privileged and which is not subject to disclosure. . . . Whether there should be a disclosure is within the discretion of the trial court and, like other discretionary matters, the determination of the court should be made by a balancing of interests. The exercise of discretion, like other matters of discretion vested in trial courts, will be considered upon review for an abuse of discretion. It is the unusual and exceptional case where the determination of the trial court is set aside. Swanner v. United States, 5th Cir. 1969, 406 F.2d 716; Adams v. United States, 5th Cir. 1958, 260 F.2d 467, cert. den., 359 U.S. 934, 79 S.Ct. 649, 3 L.Ed.2d 635 (1959). The judges of the Court of Appeals might well feel that under like circumstances they would have exercised the judicial discretion in a manner different from that in which it was exercised by the trial court. But, this is not a basis for reversing the determination of the trial court. The test is whether there has been an abuse of that discretion and in this case we hold that there was no such abuse."

430 F.2d at 1215. Although that case involved a district court and not the Board, we think its reasoning is fully applicable here. Simply because an appellate court perceives that a fairer result might have been reached through the production of certain investigative notes, it does not follow that such production should be judicially mandated. The Board did not arbitrarily refuse disclosure in this case, cf., N. L. R. B. v. Capitol Fish Co., 5 Cir. 1961, 294 F.2d 868, to the contrary, it based its refusal to produce, at least in part, on a recognized evidentiary privilege—the qualified privilege that protects the internal deliberations of a government agency. Absent some showing of manifest injustice, the Board behavior must stand or fall on the existence *vel non* of that privilege and not on what this court perceives to be the fairest way for the Board to run its proceedings. Since we find, *see* § B *infra*, that the Board's claim of privilege was legally justified, we refuse to abort the proceedings on the grounds that the Board did not follow some other procedure.

■ As further grounds for claiming that the Board proceedings were unfair, the company points out that its task of defending the back-pay claims was, in effect, impossible without the aid of the Board records. The key defensive issues in a back-pay hearing are whether the claimant had sufficiently attempted to mitigate his back-pay claim by seeking equivalent work or whether in refusing to accept a bona fide offer of reinstatement the claimant has waived his back-pay entitlement. *See generally*, N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir. 1966, 360 F.2d 569. Since much of the information regarding these questions is peculiarly within the province of the claimant's own mind, it is argued that it is unfair to preclude the company from having access to whatever relevant evidence the Board has that could be used to impeach the claimant's allegations of full mitigation efforts. That is particularly true, as the company points out, when most of the facts in issue took place some ten years earlier and the marshalling of defensive evidence is therefore all the more difficult.

■ Although this argument is logical on its face, it ignores the established law on the burden of proof in back-pay proceedings. In addition, it fails to give a fair account of the evidence available in the proceedings below. It is well established in this circuit and most others that the Board's primary duty in back-pay proceedings is to show the gross back-pay due each claimant. As Judge Wisdom stated in N. L. R. B. v. Mooney Aircraft, Inc., 5 Cir. 1966, 366 F.2d 809, 812–813:

"While the General Counsel has the burden of proving unlawful discrimi-

nation on the part of the employer, and hence that backpay is due, the employer usually has the burden of establishing affirmative defenses which would mitigate his liability. NLRB v. Miami Coca-Cola Bottling Co., supra; NLRB v. Brown & Root, Inc., 8 Cir. 1963, 311 F.2d 447. Among these affirmative defenses are the unavailability of jobs because of nondiscriminatory factors, the employees' wilful loss of earnings, and employees' interim earnings to be deducted from the backpay award." (footnotes omitted) See also, Winn-Dixie Stores, Inc. v. N. L. R. B., 5 Cir. 1969, 413 F.2d 1008, 1009; Florence Printing Co. v. N. L. R. B., 4 Cir. 1967, 37 F.2d 216, 222–223; N. L. R. B. v. Reynolds, 6 Cir. 1968, 399 F.2d 668, 669–670; cf. N. L. R. B. v. Mastro Plastics Corp., 2 Cir. 1965, 354 F.2d 170.

■■■ If the burden of proof is on the company, and not the Board, to show a failure of the claimant to mitigate fully his back-pay claim, a fortiori, there is no burden on the Board to gather this evidence and make it available. The fact that the Board might possibly possess[8] relevant evidence with potential value as impeachment material should not entitle the company ipso facto to a wholesale fishing expedition into the Board's files in derogation of the claimed privilege.

Although much can be said for a rule requiring the Board to open wide its files to all parties in proceedings such as these, we cannot forget that the Board's role in a back-pay proceeding is, in large part, to represent the interests of claimants who have already been adjudged to be entitled to reparations for the company's earlier transgressions of the Act. While we must never lose sight of the ultimate fact that the Board remains a governmental body, with concomitant obligations of impartiality in its functions, some concessions must be made to the Board's role as advocate on behalf of the public and of the victims of unfair labor practices.[9] In accommodating these necessarily conflicting roles, we believe the Board has adequately separated its prosecutorial arm from its judicial arm and that a private litigant can still get a fair hearing without the Board's role as an advocate suffering. In any event, Congress has chosen to amalgamate the Board's arms and we do not have the privilege of amputating them. Certainly, the burden of proof in back-pay proceedings, as enunciated in Mooney, is not so onerous as to require that the company be allowed to defend the back-pay claims with the Board's files in its hands. As with other prosecutorial and regulatory agencies, in order for the N. L.R.B. to fulfill its statutory duties, it must be accorded some semblance of evidentiary privilege to protect its informal investigatorial and trial-preparatory processes. See, e. g., United States v. Morgan, 1941, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429; N. L. R. B. v. Clement Brothers Co., 5 Cir. 1969, 407 F.2d 1027; Davis v. Braswell Motor Freight Lines, 3 Cir. 1964, 363 F.2d 600.

■■■ It is true that the behavior of the general counsel, the Board's prosecutorial arm, can be characterized as partisan, but we cannot say that this partisanship denied Rutter Rex a fair hearing. There is no allegation or showing that the trial examiner was in any way biased or that the Board did not accord a fair review to the trial examiner's findings. Numerous avenues for impeaching the claims were, in fact, available to the company. Literally all of the

---

8. Although a positive showing of materiality should not always be necessary, it is relevant that the company has not, with exception of the Watford claim, made a very strong showing that the Board files did, in fact, contain any evidence at all that would be usable in impeaching the claims.

9. The problem inherent in the dual role imposed on administrative bodies in litigation of this sort is thoughtfully discussed in K. Davis, 2 Ad.Law Treatise, chap. 13.

claimants were voluntarily produced by the general counsel [10] and were available for cross-examination under oath. The record indicates that the company received from the Board any statements made by these claimants that reasonably fell within the Board's Jencks rule. *See* note 12, *infra*. The back-pay specification provided the names of the claimants' interim employers and the interim earnings of each claimant. Furthermore, the general counsel supplied all of the claimants' Social Security records and the claimants themselves produced numerous documentary records pursuant to subpoena. In short, although it might have been difficult for the company to meet its burden under *Mooney*, we cannot say that it was impossible. The company was not, as it would have us believe, sent into the river without an oar. We refuse to find that a company cannot receive a fair hearing in a back-pay suit unless it has the broad access to Board investigatory files that was requested and denied here. The Supreme Court in *Rutter Rex I*, *supra*, 396 U.S. at 263, 90 S.Ct. 417, made it quite clear that this court serves a limited function when reviewing a back-pay award made by the Board. *See also* N.L.R.B. v. Seven-Up Bottling Co., 1953, 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377. With this mandate in mind, we cannot, with the exception of the Watford claim, say that this record compels a finding that the company was denied a fair hearing. *See* N.L.R.B. v. Chambers Mfg. Co., 5 Cir. 1960, 278 F.2d 715, 716; N.L.R.B. v. Vapor Blast, *supra*.

## B. *The Existence* vel non *of a Privilege for the Board's Files.*

We next deal more specifically with the company's claim that the Board's investigatory files were not entitled to the privilege or immunity from discovery accorded in this proceeding. In the course of the litigation below, the company issued a *subpoena duces tecum* requiring the Board to produce:

"Each and every statement, written and/or recorded and memoranda made by or as a result of interview or contact with any person, including back-pay claimants, which pertains to employment, search for employment, interim earnings, availability for employment and/or any other matter affecting any back-pay claimant named in the Supplemental Backpay Specification for the periods January 1, 1961 through December 31 of the year in which each individual claim terminates . . . ."

The trial examiner overruled the general counsel's petition to revoke the subpoena, but upon a special telegraphic interim appeal the Board reversed the examiner, holding that the "trial examiner's ruling is too broad with respect to matter required to be produced." The trial examiner then denied the company's motion to dismiss the supplemental specification because of the refusal to divulge and the Board upheld this denial. The question we must decide is whether the internal investigatory files of the Board, and specifically notes taken during interviews with back-pay claimants, should be accorded some evidentiary privilege protecting them against the wholesale production requested here.

We feel it is necessary to dispose first of the company's persistently urged contention that our decision in N.L.R.B. v. Capitol Fish Co., 5 Cir. 1961, 294 F.2d 868, precludes the claim of privilege relied on by the Board. *See also* General Engineering, Inc. v. N.L.R.B., 9 Cir. 1965, 341 F.2d 367. In both *Capitol Fish* and *General Engineering* requests were made by the company for the Board to produce its files relating to the issue being tried. The Board's refusal to produce in both cases was based solely on its own internal rule (§ 102.118) prohibiting the production of any Board

---

10. Louise Jackson (deceased) and Alice Denley who resides in California and whose claim is less than $25 were the only claimants not produced.

documents without the written consent of the Board or the general counsel. Since the only basis for withholding the documents was this self-created internal rule, which gave the Board unlimited ability to preserve secrecy, the courts wisely overruled the Board and required production.

In *Capitol Fish,* Judge Wisdom explicitly excepted from his ruling the type of situation before us now. He said:

"There is no suggestion in the record that the testimony sought to be elicited from the Board's attorney is privileged. . . . The Board's General Counsel made no explanation and the trial examiner was satisfied with the bare fact that the agency head charged with knowing what is right and good for the public to know had made its decision."

294 F.2d at 875. The court concluded by condemning the Board's refusal to produce because it was based solely on the whim of the Board itself, rather than on some recognized evidentiary or other privilege. "Responsibility for deciding the question of privilege properly lies in an impartial independent judiciary—not in the party claiming the privilege and not in a party litigant." *Id.* at 876.[11]

This is a different case. From the very beginning, the Board based its refusal to produce, at least in part, on the established evidentiary privilege that accords qualified protection to the informal deliberations of all prosecutorial agencies and branches of government. *See, e. g.,* United States v. Morgan, *supra*; N.L.R.B. v. Clement Brothers Co., *supra.* In scrutinizing the instant claim of privilege, we therefore receive little guidance from *Capitol Fish, supra;* rather, we must base our decision on an analysis of whether the privilege claimed is a valid one in the situation before us.

The subpoena quashed by the Board requested production of all the material from the Board's files that was obtained from the Board's investigations and interviews with the claimants. The matter contained in these files was admittedly informal, hand-written notes taken by Board officers during and after interviews with the claimants. There is no claim that any statements producible under the Board's Jencks Rule[12] were not produced. While it might be a better practice to collect formal statements from the claimants, which would be producible under the Jencks Rule, that was not the procedure followed here and we are not at liberty to dictate the in-

---

11. Similarly, in General Engineering, *supra*, 341 F.2d at 375, the court specifically said, when rejecting the open-ended claim of privilege made by the Board:
 "There are probably some court decisions which recognize a carte blanche 'privilege' of this kind. But, in view of section 10(b) of the Act, discussed above, and the last sentence of 5 U.S.C. § 22, discussed above, we believe that the claim must be particularized with reference to some generally recognized privilege accorded governmental agencies. Such, for example, are claims that the information sought would disclose confidential informants (Mitchell v. Bass, 8 Cir., 252 F.2d 513), state secrets (United States v. Reynolds, 345 U.S. 1, 7, 73 S.Ct. 528, 97 L.Ed. 727), military secrets (United States v. Reynolds, supra), or *mental processes of those engaged in investigative or decisional functions* (United States v.

 Morgan, 313 U.S. 409, 61 S.Ct. 999, 85 L.Ed. 1429; Appeal of Securities & Exchange Commission, 6 Cir., 226 F.2d 501, 519). In the proceeding now before us no such privilege was either claimed or found to exist." (Emphasis added.)

12. *See* N.L.R.B. v. Safway Steel Scaffolds Co. of Georgia, 5 Cir. 1967, 383 F.2d 273, 278. It is not disputed that the Board notes that were withheld did not contain any statements that were signed or otherwise approved by the claimants; nor were there any substantially verbatim transcriptions in the withheld files. Thus, in short, the rationale for production under the Jencks Act was simply not present here. *See Id.; see also* Palermo v. United States, 1958, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287; United States v. Blackburn, 5 Cir. 1971, 446 F.2d 1089; United States v. Roberts, 5 Cir. 1972, 455 F.2d 930.

vestigatory procedures the Board must follow.

The notes sought to be discovered here were the thoughts, deliberations and impressions of Board officials, recorded during and after interviews with the claimants. There is absolutely no guarantee that such notes are either complete or accurate. Aside from the potential inaccuracy of these notes, we must also consider the Board's interest in keeping the informal processes and deliberations of the Board free from mandatory production. This interest is grounded in the need to keep the Board's investigatory and prosecutorial functions uninhibited, and, as with the work product of any litigant, there should be some limit on the amount and type of preparatory material that can be subject to mandatory production. *Cf.* Hickman v. Taylor, 1945, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451.[13]

The fact that these were notes of non-lawyers, *see* Rule 26(b)(3) of the Federal Rules of Civil Procedure, Crocker v. United States, 51 F.R.D. 155 (S.D. Miss., 1970); *see also* Harper & Row Publishers, Inc. v. Decker, 7 Cir. 1970, 423 F.2d 487, aff'd by equally divided court, 1971, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433, reh. denied, 401 U.S. 950, 91 S.Ct. 917, 28 L.Ed.2d 234; *see generally,* Wright & Miller, 8 Federal Practice & Procedure § 2024; and non-department heads, *cf.* United States v. Morgan, *supra,* does not preclude the Board from claiming a qualified privilege for its investigative work files.

The work of the Board officers here was an integral part of the preparation of the Board's lawsuit, and the files here requested are entitled to whatever qualified privilege would normally be available to such documents. *See generally,* 4 Moore's Federal Practice §§ 26.63, 26.-64; *cf.* Southern Railway Co. v. Lanham, 5 Cir. 1968, 403 F.2d 119, 131–133.

We feel it necessary to emphasize that the qualified privilege we here recognize is not a blanket privilege that arises solely from the fact that the information being sought is investigatory matter in the hands of an investigatory or prosecutorial agency. There is no such universal privilege, qualified or otherwise. Rather, in any given situation there may be—or may not be—a qualified privilege.[14] It all depends on who is investigating, what is being investigated, and the nature and content of the information sought to be discovered from the investigator. Here, where the investigative material sought was informal impressions and deliberations, the qualified privilege attaches.

Another fatal deficiency in the company's subpoena is that in seeking to gain access to the Board's files for impeachment material, it failed to state with sufficient particularity what value, if any, the files would have to it. "Although a party is entitled to production of documents that would be useful to impeach a witness, his mere surmise that he might find impeaching matter has been held not sufficient to justify production." Wright & Miller, *supra,* §

13. Although the need to prevent inhibition of employee testimony is not quite as great in a back-pay interview as it is in unfair labor practice cases, we feel that what Judge Morgan has called "the common sense necessity of protecting the investigatory function and procedures of the Board" deserves recognition here. Clement Brothers, Inc. v. N.L.R.B., 282 F.Supp. 540, 542 (N.D.Ga., 1968), aff'd. 5 Cir. 1969, 407 F.2d 1027.

14. The differences between the issue of whether an evidentiary privilege exists

and the issue of whether an existent privilege has been overcome so as to deny its availability in the particular circumstances is a substantive difference and not a semantical one. Recognition of the difference may control, among other things, the respective burdens of the claimant of the privilege and of the seeker of information to come forward with evidence and the burden of ultimate persuasion as to whether the information is or is not to be produced. We do not in this case create a plenary privilege where no such privilege theretofore existed.

2025 at 226–227; *see* Hauger v. Chicago, R.I. & P.R. Co., 7 Cir. 1954, 216 F.2d 501, 508. The primary balancing interest favoring production is need. The requisite showing of materiality and necessity must be greater than the utter speculation exhibited here by Rutter Rex if the privilege is to be overriden.

In sum, we believe that the Board's claim of privilege was properly interposed, *cf.* N.L.R.B. v. Capitol Fish, *supra,* and that the Board did not abuse its discretion in granting the motion to quash the subpoena or in refusing to dismiss for non-production of the files. The privilege we here recognize is not, to be sure, an unqualified one. Rather, it recognizes the fine balancing of interest that is involved in the creation, enforcement, and drawing of exceptions to any evidentiary rule. Were the documents here sought more facially reliable, or if there did not exist any feasible alternative means to impeach the claimants,[15] or if there were a more specific demand than the one made here, the balance might very well be struck in such a way as to overcome the qualified privilege protecting the Board's investigative files.[16]

Whether we label the protection here accorded the Board's files a "privilege" or a qualified "immunity" from discovery is not essential.[17] What is important is that in seeking to pierce this privilege, the factors favoring production, including *inter alia,* reliability, materiality, necessity, and specificity, must outweigh the factors in favor of the qualified protection. In the case before us, we find that the balance was properly struck by the Board's granting of the motion to quash.

### C. The Board's Refusal to Produce the Watford File for Purposes of Refreshment.

Although closely related to the above discussion, we find that the Board's refusal to provide the file containing officer Lacey's notes, when requested to refresh Lacey's memory on the stand, warrants both a separate discussion and a different result.

During the board hearing on the second back-pay specification the company called as a witness John T. Lacey, a retired Board compliance officer who had interviewed Fannie Watford, to testify as to his recollection of Watford's claim. Watford ultimately was awarded back-pay of $9,592 for the period July 25, 1961, through April 19, 1968, the Board having found that no reinstatement was offered prior to the latter date. The company vigorously opposed the finding, claiming that Watford had, in fact, been offered reinstatement in December, 1961, and, in fact, there was some evidence of such in the record. The company lacked specific documentation for its allegation that Watford was offered reinstatement in 1961, and sought the testimony of Lacey. The company believed that Lacey could give testimony that Watford had, during an interview, admitted that some sort of offer had been made to her by the company in 1961.

The following exchanges took place at the hearing before the trial examiner after it had become clear that Lacey was unable to recall the details of the Watford interview:

"BY MR. LUND [Counsel for Rutter Rex]:

Q. Did you make a memorandum of your interview with Mrs. Watford?

---

15. Again, we repeat that the Board voluntarily produced all claimants, the claimants were subject to examination under oath, *see* 4 Moore's Federal Practice § 26.64 [3], n. 12 and cases cited therein, numerous earnings records were made available to the company, and all Jencks Acts statements were produced.

16. In Davis v. Braswell Motor Freight Lines, Inc., 5 Cir. 1966, 363 F.2d 600, 605, Judge Thornberry stated the issue thusly: "Since Braswell has not presented sufficient justification in this case for overriding this privilege, the sound policy behind the privilege requires that the subpoena be quashed."

17. *See* Wright & Miller, *supra,* § 2025.

A. [Lacey] I believe I did because I think I made one in each and every instance.

Q. Do you know where that memorandum is today? Do you have it with you?

A. No, I don't have any of that material. It was retained by the Board when I left but all I can suggest is that wherever I had made notes, there was an individual file folder for a particular person and it would be contained in that small file for that person.

Q. Do you think a reference to that file folder would help you refresh your recollection on this individual?

A. It might well do that. I couldn't be certain of that. 'It would be dependent upon how extensively I had taken notes. It's the only method whereby I think my memory could be refreshed.

. . . . . .

MR. LUND:

I would call for production of the file Mr. Lacey referred to containing the memorandum of this interview.

MR. CHAMPAGNE [Counsel for N.L. R.B.]:

We will not furnish them, Mr. Examiner. It does not fall within the purview of 102.118 and the Board's rule and regulations are, and Mr. Lacey is not an employee of the Board anymore.

MR. JOHNSTON [Counsel for N.L. R.B.]:

Mr. Lacey is not testifying as our witness.

TRIAL EXAMINER:

Perhaps you could interpret to me what the Board means when it says, "The Trial Examiner's ruling is too broad with respect to the matter required to be produced." Now, the Respondent has narrowed it.

MR. CHAMPAGNE:

Except for one thing, Mr. Examiner. Your ruling pertained to Mr.

Norton [Board Attorney], as I recall, and this is not Mr. Norton.

TRIAL EXAMINER:

That's right. But it refers to the Board's files. I take it you are raising the privilege against disclosure. Is that what you're raising?

MR. CHAMPAGNE:

To someone other than a Board employee. Mr. Lacey is not testifying as a Board employee, from the files of the Board.

TRIAL EXAMINER:

I have not reached the point where there should be any waiver of privilege. I am simply indicating that now we have a specific request for specific information which has to do with something that is in the files of the Board. Are you standing on the privilege not to produce them?

MR. CHAMPAGNE:

He is not entitled to them because he is not an employee of the Board.

. . . . . .

TRIAL EXAMINER:

We have a situation where the Trial Examiner has held that any evidence Mr. Lund is seeking to adduce is material to these proceedings. We have a witness whose memory is not such that he can remember the content of an interview which he had with a party to these proceedings, a claimant, and what would refresh his recollection now is in the hands, held by the Government. Are you taking the position that the Government can hold that memorandum, stand upon the privilege of 102.118? Is that your point of view?

[A short recess was then taken at the Board's request]

. . . . . .

MR. JOHNSTON:

We will not at this time furnish it, since there has been no ruling that we are required to.

MR. LUND:

I ask for such ruling. I call for production of the records and the witness is here prepared to refresh his recollection from it. It is his record and it is being used for that particular purpose, in refreshing his recollection. So, I would ask—

TRIAL EXAMINER:

Are you asking that the Trial Examiner order General Counsel to produce the records?

MR. LUND:

I call for production of it and suppose I would ask the Trial Examiner to order it produced.

. . . . . .

I think it would be relevant and admissable [sic]. If the memorandum is here, it is relevant and admissable [sic] and we simply ask that he be allowed to refresh his recollection.

[At this point there was further testimony involving the Watford claim, various letters were produced and it became clear that there was at least some question as to whether reinstatement was offered prior to 1968].

. . . . . .

A. [LACEY, in response to question whether reinstatement had been offered]:

Like I say, I'm just at a loss without reference to perhaps some other records that would reflect some information that would refresh my memory.

Q. Such as the memoranda we referred to before, that would be likely to be in Mrs. Watford's personal file.

A. Possibly.

. . . . . .

TRIAL EXAMINER:

Do you have further questions of this witness?

MR. LUND:

I would ask, in view of Mr. Lacey's further testimony, whether the Government would now produce the memorandum. To me, it is simply a question of this witness reviewing his records. So, I would just reiterate that request and then I have a few questions to ask him on another point.

TRIAL EXAMINER:

What's the Government's position?

MR. CHAMPAGNE:

Mr. Examiner, we don't think he has laid a proper foundation. First of all, he appears to be fishing for them. Secondly, this is his witness, not ours. The Government did [not] call him. Section 102.118 of the Board's rules and also Ra-Rich pertaining to witnesses that are produced for cross examination—

. . . . . .

MR. CHAMPAGNE:

Mr. Examiner, we would stand on Rule 102.118, that the proper request has not been made for these records through the General Counsel. It is not General Counsel's witness and does not come under 102.-118 or Ra-Rich on cross examination. He's on a fishing expedition and Mr. Lacey said his decision was probably made on the April 16th letter and nothing else and he just said there was a possible memorandum in the file, which has not been established. These are all the work product of an individual and we reiterate that he is his witness and I don't believe there is any applicable Board law or procedure or any other precedent that has been established that requires production of these documents pursuant to any subpoena duces tecum issued upon us and, also—

. . . . . .

TRIAL EXAMINER:

Any further questions of this witness [Lacey]?

(No response.)

TRIAL EXAMINER:

If not, this witness is excused.

MR. CHAMPAGNE:

Just a moment, Mr. Examiner.

One thing I do want to bring up before he leaves, as I recall at this point in connection with any possible memoranda that Mr. Lund had requested from my files pertaining to Mr. Lacey's testimony, that we had argument on this but I don't believe you directed us to produce or have ruled on it, at this point and Mr. Lund just decided to go ahead.

MR. LUND:

I don't intend to withdraw from any position I have taken on the record. I also think there ought to be a point where an issue was framed and we ought to go about concluding the hearing but I don't withdraw from any position I have taken.

TRIAL EXAMINER:

It is not clear in the Trial Examiner's mind whether there is anything for him to rule on in this respect.

MR. CHAMPAGNE:

We have nothing of Mr. Lacey.

TRIAL EXAMINER:

You may be excused, Mr. Lacey."
App. Vol. 2, pp. 940–978.

Although the record is far from precise on this point, our reading of the foregoing leads us to conclude that the company did, both as a matter of fact and law, make a sufficient request at the hearing for the Watford file to be produced for the purpose of allowing Lacey to refresh his memory and that the Trial Examiner acceded to the Board's refusal to produce the file. The following narrow question is therefore before us: Should the general counsel have been required to produce the Watford file, containing Lacey's notes, for the purpose of allowing Lacey to refresh his memory?

Although Lacey's notes were part of the internal files that we have today held were not producible under a subpoena duces tecum, there are several factors that distinguish this particular request for the Watford file. First, the primary justification for the existence of the qualified privilege for the Board's internal files is to protect the government's interest in retaining some sort of confidentiality in its internal deliberations. The request here was not for the entire set of 33 files but only for the Watford file and, in particular, Lacey's notes within that file. Had Lacey's memory been better, he could have recited the material from the stand. At one time he did have access to all of the material that was being requested, much of which was, in essence, his own personal deliberations on the matter. It is true that Lacey was no longer with the Board, but we think that fact is not crucial here.

The Board has little real need to prevent its former officers from remembering a particular factual matter. We are not here dealing with some sort of military information that the government has an overriding interest in keeping secret. The confidentiality sought to be preserved in the type of case before us is the internal communications and deliberations of the agency members themselves. It serves little purpose to expand this privilege to the point where the Board can withhold notated deliberations from the very person whose deliberations are being sought. Admittedly, a similar argument can be made regarding the need to preserve the confidentiality of the entire back-pay files. But the point is that, in this instance, the argument for preserving the confidentiality of one file from the eyes of one who at least partially constructed the file is far less compelling than when we were dealing with the company's broadly addressed subpoena duces tecum.

A second distinguishing feature is that the request here made was more narrow and specific than the subpoena request. Unlike the subpoena which was, in effect, a request to use the Board's investigatory files in order to uncover *any* information that might possibly benefit the company's case, this re-

quest had a very narrow focus and purpose. Lacey had stated on the stand quite clearly that if he could see the file, he might be able to clear up in his own mind the narrow question of Fannie Watford's reinstatement offer. The Watford file was sought with this in mind, and as the Trial Examiner apparently recognized, this request cannot be compared to the "fishing expedition" that was attempted with the subpoena.

Third, we must pay due deference to the purpose for which the files were requested. The specific reason was not to obtain evidence that the company could use to impeach Watford's claim. That was the sole purpose of the subpoena requesting all of the files. Rather, the Watford file was sought for the explicit purpose of refreshing the recollection of a witness who was already on the stand and testifying directly about a matter that he himself thought could be more accurately resolved if he could review the file.

 The law is well established that in many situations a party cannot depend upon an otherwise valid evidentiary privilege when an otherwise inadmissible item is being used for the purpose of refreshing a witness' memory and is not being used as evidence. For example, in Thompson v. United States, 5 Cir. 1965, 342 F.2d 137, the defendants, on appeal from their criminal conviction, claimed that it was error to permit a police officer, testifying against them to use certain of his own recorded statements to refresh his memory on the stand. It was admitted that the recorded statements were inaccurate, and that they were dictated, but not recorded by the officer on the stand. It is clear that the statements would have been inadmissible as independent evidence. We held there that as long as the district court properly supervised the use of the statements to refresh and that they were genuinely used only for that purpose, it was not error to permit the use of the otherwise unreliable and inadmissible recorded statements. *See also,* Allis-

Chalmers Mfg. Co. v. City of Fort Pierce, Fla., 5 Cir. 1963, 323 F.2d 233; United States v. Baratta, 2 Cir. 1968, 397 F.2d 215; United States v. Tolbert, 7 Cir. 1966, 367 F.2d 778; Kramer v. Commissioner, 7 Cir. 1968, 389 F.2d 236; Hall Bartlett Prod. v. Republic Pictures Corp., 20 F.R.D. 625 (S.D.N.Y.1957); *see generally,* III Wigmore §§ 758–765 (Chadbourn Rev.). The technical prerequisites for refreshment were clearly met by Lacey. These are, as we said in Thompson v. United States, *supra,* 342 F.2d at 139, that "the witness demonstrated a need for having his memory refreshed and the paper used had that effect." This is not a case of one party seeking to have items in his possession, otherwise excludable, admitted into evidence under the questionable guise of refreshing a witness' memory. *Cf.* N.L.R.B. v. Hudson Pulp and Paper Corp., 5 Cir. 1960, 273 F.2d 660, 665–666, but rather this was a legitimate effort to refresh an exhausted recollection.

We are aware that most of the cases allowing refreshment deal with claims that the item sought to be employed was inadmissible, generally under the hearsay rule, and that in this case the use of an item for refreshment was being objected to by the party who was in possession of the items and who was withholding them under a claim of privilege. But as we said earlier, the privilege here claimed is a qualified one, and it is defeasible on good cause shown. Certainly, the reasoning underlying the above cited cases, which clearly favors the allowance of refreshment even where items are otherwise inadmissible can be applied here. In short, (1) since the items were being sought solely to refresh and not as evidence; and (2) since the law clearly favors the procedure of permitting a witness to refresh an otherwise exhausted recollection from items, admissible or otherwise, that are capable of jolting the memory, the Board's claim of privilege when confronted with the request for the Watford file is much weaker than in the case of the broad subpoena.

A fourth reason for treating the request for the Watford file differently from the broad subpoena request is the clear showing made here by the company that production of the Watford file for the purpose of refreshing Lacey's memory might very well resolve a disputed material factual issue. Throughout Lacey's testimony it is clear that the company might possibly have offered reinstatement to Watford in December, 1961, and if this was the case, the award to Watford would have been only a fraction of the ultimate award granted. The file was sought solely for the light it would throw on this issue, and from our reading of the record, there is a good chance that production of the file could have resolved the issue, at least in the mind of witness Lacey. Unlike the subpoena, for which there was no showing of any specificity that anything in the file would have had impeachment value, the request for the Watford file was supported by a clear showing of materiality and for that reason we feel its non-production was prejudicial to Rutter Rex.

Finally, despite the existence of many of the similar dangers of unreliability discussed above, there are good reasons for treating the reliability problems of the Watford file request differently. In the case of the subpoena request, we are dealing with files the use of which for impeachment purposes would be fraught with dangers of double hearsay. Not only would we be allowing the interviewer's notes of what the claimant said to be used for disputing the truth of what the claimant was alleging (one level of hearsay), we would be ascending to the second level of hearsay because there is no guarantee that the author of the rough interview notes in each file would be available to testify as to the accuracy of his own recorded impressions. The use of interview notes under such circumstances cannot be considered conducive to the ascertainment of a reliable factual picture and, indeed, it might likely be counterproductive to the search for truth.

By contrast, the use of Lacey's notes to refresh his own recollection has little if any of these dangers. The second level of hearsay is removed by virtue of the fact that Lacey is present, on the stand and subject to cross-examination as to any matter adduced from his notes. The objection to the first level of hearsay, arising from the use of Lacey's notes as to what Watford said in the past, is answered by three factors. First, the claimant, Watford, did in fact appear and was available for examination and cross-examination as to any matter ascribed to her by Lacey's recorded impressions. Secondly, any of Watford's statements from the interview that are usable against her on the issue of reinstatement are technically admissions and would thereby be exempt from the exclusionary rule. See, McCormick, Evidence §§ 39, 239; see also, Straughan v. Barge MVL No. 802, 291 F.Supp. 282, 285 (S.D.Tex.1968). Thirdly, and most important of all, the Watford file was not requested for use to impeach nor as evidence; rather, we are asked only to allow its limited use to refresh the memory of a witness.

It must be remembered that in upholding the Board's quashing of the subpoena, we were strongly influenced by the inherent unreliability of the rough interview notes. With Lacey, once he was on the stand and testifying as to what he remembered about the interviews in question, we cannot believe that allowing him to see his own notes, however incomplete or inaccurate they may be, would present the same dangers as directly using incomplete interview notes to impeach all the claimants. The company sought these notes solely as a means to help Lacey better remember, and we agree that the quest was a proper one.

■ For all of the foregoing reasons we find that even though the Board was not required to produce all of its interview and investigative files relating to the back-pay order, the trial examiner did err in not requiring the Board to produce the Watford file for the narrow

purpose of allowing Lacey to refresh his memory. We emphasize that the file was producible only for the purpose of refreshing Lacey's memory and not for use as independent evidence for the company to use to impeach Watford. For all the reasons outlined in section B, *supra*, the files retain the qualified privilege regarding their use as evidence. *See* Allis-Chalmers Mfg. Co. v. City of Fort Pierce, Fla., *supra*.

■ Since we find that the Board erred in refusing to produce Watford's file for the purpose of allowing refreshment of witness Lacey's memory and that such refusal was prejudicial, it follows that Rutter Rex was denied a fair hearing on the claim of Fannie Watford. The company is entitled to a new hearing before the Board on the Watford claim, at which time the Board must permit Lacey to review the Watford file if a similar situation arises.

The company further asserts that the trial examiner should have applied an adverse inference against the Board when it failed to produce relevant evidence. *See* Auto Workers v. N.L.R.B., D.C.Cir.1972, 79 LRRM 2332. Although this might be appropriate in certain situations, we feel that it would be a fairer disposition to remand the Watford claim and give the general counsel an opportunity to produce before applying an adverse inference that would prejudice the innocent claimant.

Our holding does not give the parties in a Board proceeding the right to subpoena Board investigative personnel as a device to circumvent otherwise valid Board privileges, and we assume that the factual posture of this case is somewhat unique. Our holding is limited in that Lacey voluntarily appeared; he explicitly testified that he once had knowledge of the fact at issue and that if he could review the file, his recollection of that fact could probably be revived, and that due to his retirement, he no longer had access to the file.

As we stated in part B., *supra*, the evidentiary privilege asserted by the Board to protect its informal investigative deliberations is a qualified one that can be overcome when the need for production outweighs the rationale for the privilege. Professor Moore has defined our task in these cases as follows.

"Whether particular material is or is not privileged must be determined from case to case and not on the basis of any general formula that all Government files are privileged. On the other hand, a blanket inspection of Government investigation files should not be allowed.

. . . . . .

"In each case the court must also balance the degree of necessity for disclosure shown by the private litigant against the importance of the maintenance of secrecy as to the particular privileged matter."

4 Moore's Federal Practice § 26.26 [6.–4] pp. 316–317.

After carefully balancing the interests asserted here, we uphold the Board's quashing of the subpoena, but we find that the Board erred in not permitting Lacey to view the Watford file for the purpose of refreshing his memory.

## III. Sufficiency of the Evidence

■ Rutter Rex contends that the awards to many of the claimants were not supported by the evidence and should therefore be disallowed by this court. Rutter Rex correctly argues that a claimant is not, under the law, entitled to back-pay to the extent that she (1) fails to remain in the labor market during the period for which back-pay is claimed, (2) refuses to accept substantially equivalent employment, (3) fails to search diligently for alternative work, or (4) voluntarily quits alternative employment. N.L.R.B. v. Mastro Plastics, *supra*. Despite these requirements, however, the law is also clear that the defense of willful loss of earnings is an affirmative defense that places the burden of proof squarely on the employer. N.L.R.B. v. Mooney Aircraft, Inc., *supra*, 366 F.2d at 813. If the employee

shows that gross back-pay is owing to him, the burden is then on the company to disprove liability by showing the existence of any of the four above factors. *See* N.L.R.B. v. *Cashman Auto Co.*, 1 Cir. 1955, 223 F.2d 832.

The company, dividing the claimants into categories, contends that it met its burden by proving that many of the claimants did not meet their mitigation obligations and that therefore we should disallow the claims. We reject the company's arguments categorically.

■ A. Category 1—This group consists of eleven claimants [18] who Rutter Rex claims remained at low paying jobs while laid off from the company and who therefore "failed to seek substantially equivalent employment" as they are required to do. There is substantial evidence in the record indicating that these claimants were quite possibly working at the highest level of employment they could find. Certainly by "lowering their sights" and accepting what might have been the best job available, the claimants were doing all that could reasonably be expected of them by way of mitigation. *See* N.L.R.B. v. *Southern Silk Mills*, 6 Cir. 1957, 242 F. 2d 697, cert. denied, 355 U.S. 821, 78 S. Ct. 28, 2 L.Ed.2d 37.

■ B. Category 2—In this group the company places four claimants [19] whose mitigation efforts, in part, were proved by showing that they remained eligible for state unemployment compensation. Since the state unemployment procedures were apparently quite lax and one could evidently remain on the rolls without ever making a bona fide effort to find employment, the company argues that it was error for the trial examiner to base his finding of the claimant's eligibility on this. Although we agree that meeting the state eligibility requirements for unemployment benefits should not, in itself, be sufficient to meet the burden of due diligence, *see* N. L.R.B. v. *Pugh & Barr, Inc.*, 4 Cir. 1953, 207 F.2d 409, we find substantial evidence, other than the unemployment qualification, in the record of a bona fide effort made by each of the four claimants to obtain employment at various times during their eligibility period.

■ C. Category 3—This group consists of four claimants [20] who the company asserts confessed to a Board agent in May, 1963, that they had abandoned any interest in returning to Rutter Rex. The trial examiner excluded as irrelevant an offer of evidence as to this. The company, claiming that this materially bears on the question of mitigation effort, urges that this was error. We agree with the Second Circuit that exclusion of such statements, although possibly probative on the issue of mitigation effort, should not constitute reversible error where there is no real indication that the statements were reliable. *Heinrich Motors, Inc.* v. *N.L.R.B.*, 2 Cir. 1968, 403 F.2d 145, 149–150. As did the Second Circuit, we believe that the statements here excluded "are of little value in determining whether there has been a withdrawal from the labor market or a waiver of reinstatement when they [the statements] are made before the Company has offered reinstatement". *Id.* at 150. Here, the only basis for asserting that the claimants

---

18. Doris E. Bowles
 Ethel Mae Foreman (Askin)
 Jimmie Lou Green
 Louise Jackson
 Eunice E. Johnson
 Dorothy White (Learson)
 Adele Nash (Hall)
 Desideria O'Campo
 Yvonne Parnell (Charles)
 Dorothy K. Reed
 Beatrice White (Lane)

19. Victoria Allen
 Marguerite Bozonier
 Sonora Barnes (Rochon)
 Gustavia Haynes Gale

20. Mariam Cheri
 Gloria Dixon
 Desideria O'Campo
 (Also included in Category I)
 Marjorie Walker

abandoned interest were some contested notations in the Board files. Under such circumstances we consider *Heinrich* fully applicable and we refuse to hold that the exclusion of this evidence was reversible error.

D. Category 4—This group contains two claimants [21] who the company asserts should have had their back-pay period terminated at the time they temporarily left the job market for health reasons. This argument is based on the company's contention that the claimants would not have been entitled to return to work after such an absence if they had been working at Rutter Rex. This argument assumes that Rutter Rex did not have any sick leave policy that would permit employees leaving for health reasons to return to work. In *Rutter Rex I*, the Board found "the record shows a general pattern among the female employees of leaving [the Company's] employ because of pregnancy, illness, etc., and later returning to work." 158 N.L.R.B. at 402. The company has not shown that such a policy does not still exist and we cannot say that the Board's finding that back-pay should not be terminated was improper.

E. Category 5—In the fifth and final category the company lumps Bernice Cooper Lee, whose claim we already disposed of in § C, *supra*, and Georgiana Davis (Deruisa), who the company claims could not meet her burden of seeking employment because of her need to stay home with little children. There was no direct testimony that Deruisa was in fact unavailable for work during the day, and we agree with the trial examiner that the company's contrary assertion was "sheer speculation." In sum, the company not having

disproved the claimants' eligibility, we find that there was substantial evidence to support all of the awards.

By way of conclusion, we must add a word relating to the seemingly never ending posture of this case. If this litigation were a drama, it would be either a farce or a tragedy. With statistics to the right of us and statistics to the left of us, these eighteen long years of judicial journeying furnishes a demonstrable example for those who deplore litigation delay. There are those, be they a diminishing breed, who believe that justice shall triumph over time. Once again, we are hopeful that precedent, logic, and law, here merging with common sense, will enable us to write *finis* to this elongated contretemps.

In crossing the bar of decision we hope, but do not really believe, that the combatants will retire in silence, if only to nurse their wounds. Having uttered our novena for speed, however, we cannot forsake the belief that litigants believing in the rectitude of their cause are entitled to their days and perhaps years in court, we shall never fail in our duty to keep the forum open, our ears dinned daily by the anguished cries of judicial statisticians. In summary, we deplore the delay, but we would not substitute one hour of efficiency for one moment of justice.

After carefully considering each of the company's contentions of error, we order, with the exception of the Watford claim, enforcement of the Board's entire back-pay order. The Watford claim is remanded to the Board for further proceedings not inconsistent with this opinion.

Enforced in part. Remanded in part.

---

21. Adele L. Robertson
 Rose Marie Hicks