**J. H. RUTTER REX MANUFACTURING COMPANY, INCORPORATED**

v.

**UNITED STATES of America.**

**Civ. A. No. 71–1960.**

United States District Court,
E. D. Louisiana.

April 30, 1974.

Montgomery, Barnett, Brown & Read, Henry J. Read, Daniel Lund, New Orleans, La., for plaintiff.

James D. Carriere, Asst. U. S. Atty., New Orleans, La., for defendant.

## ORDER

R. BLAKE WEST, District Judge.

This action, based upon the Federal Tort Claims Act, arises from a labor dispute which occurred in 1954 and which has been the subject of almost continuous litigation since that time.[1] By means of the instant lawsuit, plaintiff seeks damages allegedly occasioned by the delay of defendant's agency, the National Labor Relations Board (hereinafter the Board), in implementing the enforcement order of the Board dated February 13, 1956, which required job reinstatement to certain of the striking employees, as well as back pay to these employees. Plaintiff alleges that the Board "negligently failed and omitted to take any action" pursuant to the order until November, 1961. Plaintiff asserts that this delay impaired its ability to defend the individual back pay claims ultimately designated in the back pay specification (filed on November 16, 1961, and supplemented on November 30, 1970) and caused the claims to increase substantially in amount during the prolonged period of delay.

After failing in an attempt to have the back pay specification reduced because of the delay (N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 396 U. S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969)), the company paid the required back pay and subsequently filed this action for damages pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346, 28 U.S.C. § 2674.[2]

For the following reasons, the Court is of the opinion that, despite the damages suffered by plaintiff as a result of the Board's inexcusable delay, plaintiff has no basis for recovery against defendant.

It is the position of plaintiff that the Board's delay violated its duty to proceed with the reasonable dispatch required of the Board by the Administrative Procedure Act, 5 U.S.C. § 555(b),[3] and that such violation renders defendant liable under the Tort Claims Act.

It is the position of defendant that the action taken by the Board (or its inaction) constituted a discretionary function of a governmental agency and

---

1. See: N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 229 F.2d 816 (C. 5, 1956); N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 245 F.2d 594 (C. 5, 1957); N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 305 F.2d 242 (C. 5, 1962); J. H. Rutter—Rex Manufacturing Co. v. N. L. R. B., 399 F.2d 356 (C. 5, 1968); N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969); J. H. Rutter—Rex Manufacturing Co. v. N. L. R. B., 473 F.2d 223 (1973).

2. "§ 1346(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

"§ 2674. *Liability of United States*

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ."

3. With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it. This subsection does not grant or deny a person who is not a lawyer the right to appear for or represent others before an agency or in an agency proceeding.

therefore was not a basis for an action under the Tort Claims Act.[4]

The parties having entered into a lengthy stipulation of facts (See Appendix), the matter was submitted to the Court for what is hoped will be a final disposition of a case which, " . . . beclouds the highly respectable idea that all litigation must, some day, come to an end." J. H. Rutter—Rex Manufacturing Co. v. N. L. R. B., 399 F.2d 356, 357 (C. 5, 1968).

After careful consideration of the matter, it is the opinion of the Court that the delay in completing the back pay specification on the part of the Board was "inordinate"[5] and "deplorable",[6] and that plaintiff company was in fact damaged both in its ability to defend the specification finally filed and by the increased amount of the required payments occasioned by the delay. However, the Court is also of the opinion that the situation at bar is illustrative of the principle of *damnum absque injuria*. Plaintiff has failed to provide, and the Court has been unable to find, any authority which supports plaintiff's contention that unreasonable delay in violation of the dictates of the Administrative Procedure Act renders defendant liable in damages under the Tort Claims Act. On the contrary, it is the opinion of the Court that the action of the agency in allocating its enforcement case load was an act of discretion within the meaning of 28 U.S.C. § 2680(a). Eastport Steamship Corp. v. United States, 372 F.2d 1002, 178 Ct.Cl.

599 (1967); Coastwise Packet Co. v. United States, 398 F.2d 77 (C. 1, 1968), cert. den'd 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968).

While the length of the delay in this case was deplorable, it is the Court's opinion that it was just this type of governmental liability which the Congress sought to avoid by means of the exception contained in 28 U.S.C. § 2680.[7]

For the foregoing reasons, it is ordered that judgment issue in favor of defendant, United States of America, and against plaintiff, J. H. Rutter—Rex Manufacturing Company, dismissing the claim of plaintiff with prejudice, each party to bear its own costs.

## APPENDIX

## STIPULATION OF FACTS

### I.

J. H. Rutter Rex Manufacturing Company, Inc., is a manufacturer of garments with a plant located in the City of New Orleans, at 3725 Dauphine Street. On April 21, 1954, the production and maintenance employees at this plant went on strike. Approximately six hundred (600) employees struck the company, shutting down the entire operation. The strike which later became the subject matter of proceedings before the National Labor Relations Board, was found by the Board to have been economic in origin but converted some time after its inception to an unfair labor practice strike as reflected in the deci-

---

4. 28 U.S.C. § 2680. *Exceptions.*
   The provisions of this chapter and section 1346(b) of this title shall not apply to—
   (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

5. J. H. Rutter—Rex Manufacturing Co. v. N. L. R. B., 399 F.2d 356 (C. 5, 1968).

6. N. L. R. B. v. J. H. Rutter—Rex Manufacturing Co., 396 U.S. 258, 90 S.Ct. 417, 24 L. Ed.2d 405 (1969).

7. It is the Court's opinion that the creation of tort liability on the part of the government for delay by its agencies in carrying out their functions would open our already overloaded federal courts to a very substantial number of disgruntled citizens seeking damages for delays of as many sorts as could be conjured up in the minds of ingenious lawyers.

sion of the Board in Rutter Rex Mfg. Co., 115 NLRB 388, at p. 390 (1956).

## II.

On April 20, 1954, the Amalgamated Clothing Workers of America, AFL–CIO (the union) filed a charge against the company with the Board alleging a refusal to bargain in violation of Section 8(a)(5) of the National Labor Relations Act [29 U.S.C. § 158(a)(5)]. This charge was amended on August 26, 1954. On August 31, 1954, after investigation, the Board issued a formal complaint and notice of hearing alleging that Rutter Rex had unlawfully refused to bargain with the Union after the commencement of the strike. Rutter Rex's answer to the complaint was filed with the Board on September 16, 1954 alleging that its refusal to bargain with the Union after the commencement of the strike was justified because the Union struck in violation of an agreement not to strike. (See 115 NLRB 388).

## III.

On October 4, 1954 a formal hearing convened on the complaint of the Board against Rutter Rex. The hearing closed on March 8, 1955.

## IV.

On April 4, 1955 the Union terminated the strike. On April 5, 1955, the Union notified Rutter Rex by letter of the termination of the strike and attached a list of names and addresses of 114 employees who were unconditionally applying to return to work. Twenty-five more names were submitted on April 8, 1955. On April 11, Rutter Rex wrote the Union stating that those persons who desired to return to work should file an application with the personnel office as soon as possible and stated, "Since we cannot process all applications at one time, we would suggest that you have the applicants come in at the rate of not more than 20 per day." On April 22, 1955, the Union notified the company that " . . . although we have sent your employees in groups of 20 per day, as you requested, we consider those employees as having unconditionally applied for employment on the date you received our registered letters . . . ." On April 22, fifteen additional names were submitted to the company and on May 13, six additional names were submitted.

## V.

With the termination of the strike, the company commenced the process of rebuilding the balanced line operations of the plant. The production set up before and after the strike and the rebuilding process is more completely explained in the testimony of Mr. Carl Striegal, Industrial Engineer of Curt Salmon and Associates presented to the National Labor Relations Board during hearings in 1963. A copy of this testimony is annexed hereto as Exhibit 1. There were numerous problems involved in reinstatement of returning strikers. These included availability of jobs considering the balance line operation, difficulties encountered in rebuilding the plant caused by loss of customers during the strike and changes. in products, availability in the labor market of employees at times when their skills were needed, communications with employees, voluntary termination of employment by strikers, etc.

## VI.

On July 29, 1955, a Board Trial Examiner issued his decision and recommended order in the pending case. This decision was affirmed by the Board who, on February 13, 1956, issued an order requiring Rutter Rex to take certain affirmative action pertinent here as follows:

"Upon application, offer immediate and full reinstatement to their former or substantially equivalent positions to all those employees who went on strike on April 21, 1954, or thereafter, without prejudice to their seniority or other rights and privileges, dismissing if

necessary all persons hired on or after that date, and make such applicants whole for any loss of pay suffered by reason of the Respondent's refusal, if any, to reinstate them in the manner set forth in the section of the intermediate report of the trial examiner of the National Labor Relations Board dated July 29, 1955, entitled 'The Remedy'." (115 NLRB 388).

## VII.

Neither the Board's order nor the subsequent enforcing decree of the Fifth Circuit (see paragraph IX., infra) named the specific individuals encompassed therein, their dates of entitlement to or amounts of backpay, if any, due. This general order was issued because the record upon which it rested did not contain evidence of the termination of the strike on April 5, 1955, or evidence of applications for reemployment made by strikers prior to the date of the order or evidence of the actions of the company in response to such applications. Because of these factors and because of the factors mentioned in paragraph V. above, compliance with the order was a complicated matter which raised numerous issues and differences of opinion between Rutter Rex and the Board as to the extent of Rutter Rex's reinstatement obligations.

## VIII.

On February 15, 1956, the Board wrote to Rutter Rex with respect to compliance with the Board's order. (Exhibit 2). The company informed the Board that it considered the Board's decision erroneous and that it refused voluntarily to comply therewith, as reflected in correspondence from the Board to the company and from the company attorney to the Union dated March 7, 1956, Exhibits 3 and 4 respectively.

## IX.

On December 14, 1956, the Board filed a petition in United States Court of Appeals for the Fifth Circuit seeking enforcement of its order against Rutter Rex. After briefing, and oral argument on May 7, 1957, the Court rendered an opinion dated June 10, 1957 enforcing the order of the Board. NLRB v. J. H. Rutter Rex Manufacturing Company, 245 F.2d 594 (5th Cir. 1957). On August 19, 1957, the Court's formal decree was entered.

## X.

On August 21, 1957, the acting Regional Director of the Board's regional office in New Orleans, Charles M. Paschal, wrote to Rutter Rex offering the assistance of the Board's regional office in effectuating prompt compliance with the requirements of the decree. The letter also stated that the company would be notified at such time as the case was closed. (Exhibit 5).

## XI.

On August 28, 1957, Rutter Rex's counsel wrote to the Board in reply to the Board's August 21 letter concerning the posting of compliance notices and suggesting a conference between counsel and the Board on August 29, 1957. (Exhibit 6).

## XII.

Such conference was held August 29, 1957. In attendance were Henry J. Read, company counsel, William Fox, Board Agent, and John F. LeBus, Regional Director of the Board. Fox and LeBus are deceased. The discussion during the conference related to compliance with the Board order as enforced. The company's position was that it had already complied with the reinstatement requirements of the order and it offered to furnish the Board with records of alleged offers of reinstatement and those records which would permit determination of backpay, if any, due. The Board possessed information inconsistent with the Company's position. The nature and extent of such inconsistent information is today unknown. The minutes of the conference are reflected in a document

entitled "Initial Compliance Report" dated September 9, 1957 and initialed by John F. LeBus. (Exhibit 7).

### XIII.

The Board has no record showing that the information it had in its possession on August 29, 1957, which was inconsistent with the company's position on compliance, was given to Rutter Rex or its counsel on August 29, 1957 or thereafter. If called to testify, Board officials would state that they have no record of giving and company officials and counsel would state that they do not recall receiving the inconsistent information referred to in Exhibit 7.

### XIV.

On September 11, 1957, company counsel wrote to the Board again respecting the company's compliance with the decree pointing out that a required notice had been posted and that the company would advise the Board as soon as· appropriate records had been assembled. (Exhibit 8). In addition, the following information was submitted to the Board relevant to the reinstatement program:

"a) On September 17, 1957, company counsel addressed a letter to the Union, a copy of which was received by the Board, informing the Union of the intentions of the company to comply with the provision of the Court decree. (Exhibit 9).

b) On October 24, 1957, company, through counsel, submitted to the Board a list of employees on the company payroll at the time of the strike who had applied for work after the termination of the strike and indicating dates of reinstatement. (Exhibit 10). (Two hundred seven strikers were reemployed prior to the end of the strike.)

c) On October 31, 1957, company counsel submitted to the Board payroll records from 1954 reflecting the rates of pay per hour and earnings of each employee on the strike list for a two-week period and the operation number of each employee. (Exhibit 11)."

### XV.

On November 7, 1957, company counsel wrote to the Board (Exhibit 12) as follows:

"Dear Sirs:

As you know, we are handling the matter of complying with the decree of the United States Court of Appeals for the Fifth Circuit enforcing the order of the National Labor Relations Board in the subject cases. Our client has already complied with some of the provisions of the decree, and is presently engaged in bargaining with the representatives of the Amalgamated Clothing Workers of America. If any instance of a failure to fully comply with the order is brought to your attention, we would appreciate you contacting us promptly so that such corrective measures as may be necessary can be immediately taken in order to assure full compliance with the decree."

The Board did not respond to this letter and the company heard nothing further from the Board until March 22, 1960.

### XVI.

On March 22, 1960, Board Compliance Officer, John Immel, wrote to company counsel requesting more information about the company's compliance with the decree. In this letter, Immel stated in regard to the Board's delay:

"We are, we realize, in the position of having delayed action in this matter over a period of several years. Under the circumstances, it may seem inconsistent that we now urge that prompt attention be given to the request. However, the delay to date has been in a large measure due to a shortage of personnel in our office." (Exhibit 13).

### XVII.

John Immel was in 1961 and is now a career employee of the National Labor Relations Board having first been employed in 1947. He was experienced in

handling compliance matters and was assigned to the Rutter Rex for purposes of compliance on August 31, 1959. He remained on the case until June 10, 1960, when the Board agent Loren Jones was assigned the compliance role.

## XVIII.

The March 22, 1960 letter from Immel was the first written communication from the National Labor Relations Board to the company or its counsel after counsel's letter of November 7, 1957 (Exhibit 12) was sent. Were they called to testify, company officials and company counsel would testify that during the interval from November 7, 1957 through March 22, 1960, the company received no communication of any type from the Board and was under the impression that the Board agreed, based on the information furnished by the company, that satisfactory compliance had occurred.

## XIX.

During this interval, as required by the Board's order as enforced, the company continued to meet in collective bargaining negotiations with the Union. Numerous meetings were held.

## XX.

At the time of the opinion of the Fifth Circuit Court of Appeals on June 10, 1957, the 15th Region of the National Labor Relations Board was faced with the compliance phase of several other cases and certain attorney-staffing problems all of which is more completely referred to and detailed in the affidavit of Charles M. Paschal, Jr. dated November 16, 1973, it being stipulated that were Mr. Paschal called to testify on these points, he would testify in accordance with the said affidavit. (Exhibit 14).

## XXI.

Were Mr. Paschal called to testify, he would further state that after the Fifth Circuit opinion was handed down on June 10, 1957, the compliance handling phase of the Rutter Rex case was assigned June 12, 1957 "on paper" to attorney Edward Champagne, who at that time was a recently hired attorney of the National Labor Relations Board whose background was in Internal Revenue matters as a special agent, Internal Revenue Service, Intelligence Division. Champagne had no prior experience in handling Board cases. Paschal would further testify that shortly after the Fifth Circuit opinion of June 10, 1957, he and Regional Director LeBus met with Kenneth McGinnis, Associate General Counsel of the Board and at that time acting General Counsel, to discuss the staff problem. Paschal would further testify that after consultation it was decided that Champagne would "break his eyeteeth" on the "Ozark Dam" case referred to in Paschal's affidavit and become the Region's backpay expert. Accordingly, Champagne was assigned to handle the Ozark Dam and Rutter Rex cases with specific instructions, administered on orders from McGinnis, that he was to handle the Ozark Dam case first and by preference over the Rutter Rex case. Paschal would further testify that at that time Champagne was not assigned to handle any other backpay case. Board agent William Fox was also assigned to gather preliminary compliance data but Fox is now deceased and the Board has no record of the work he performed.

## XXII.

Relevant information about other backpay cases pending for compliance in the Fifteenth Region in 1957 when the Circuit Court enforced the Board's order, is as follows:

*Ozark Dam*—75 potential claimants; $60,000 potential claims; backpay litigation began on January 4, 1957 and the trial was completed on March 24, 1959;

*W. C. Nabors*—17 potential claimants; Circuit Court contempt ruling in 1955; case terminated March 12, 1964 after trial and Circuit Court enforcement proceedings;

*B. V. D. Company*—44 potential claimants; $20,000 potential claims; Board order dated May 6, 1957; settlement reached August 6, 1958;

*Lion Oil Co.*—546 potential claimants; $117,000 potential claims; Court opinion date June 7, 1957; Court decree dated July 11, 1957; investigation and conferences with the company resulted in settlement on January 5, 1961;

*Rutter Rex*—600 potential claimants; potential claim not established but $342,000 was ultimately claimed for 207 claimants; Court opinion dated June 10, 1957; Court decree dated August 19, 1957.

## XXIII.

If called to testify, Board Attorney Champagne would state that immediately after his assignment to Rutter Rex on June 12, 1957, he commenced reading the transcript of the trial and case files in order to familiarize himself with the proceeding. He reviewed the documentary evidence submitted by the company, namely, a list of employees on the strike payroll who applied for work after the strike ended reflecting dates of application and dates of return to work (Exhibit 10) and the company payroll of April 17, 1954 (strike payroll) reflecting hourly rates, earnings and operation numbers. The latter was attached to Company counsel's letter of October 31, 1957. (Exhibit 11). He obtained another list from the union of the employees who the union thought had not been rehired or properly reinstated. From these lists, Champagne prepared a list of potential claimants and on January 28, 1958, mailed a form letter and social security waiver to those on the list requesting the claimants to provide interim employment information, if any, by filling in a form and signing the social security waiver. Champagne also wrote two letters to the union, March 24, 1958 (Exhibit 15) and May 12, 1958 (Exhibit 15A) forwarding a list of claimants who had not replied to his form letter and requesting the union to provide correct addresses and assistance in locating the people. Champagne would also state that from June 12, 1957 through May, 1958, he devoted approximately 20–25 working days to Rutter Rex and after June 1, 1958, he devoted full time to the Ozark Dam case the trial of which was completed on March 24, 1959. On March 24, 1959, he began work on a case known as McDermott Fabricators involving over 100 allegations of antiunion discrimination. After June 1, 1958, Champagne did not work again on Rutter Rex until commencement of trial preparations in mid-1962. Champagne would also testify that his instruction from McGinnes and Paschal when assigned the Rutter Rex and Ozark Dam cases were to handle Ozark Dam by preference and to work on Rutter Rex only when he could find time. From June 1, 1958 until August 31, 1959 when Immel was assigned, no work was performed on the Rutter Rex case by the Board.

## XXIV.

In August, 1959, the position of compliance officer was created by the Board and on August 31, 1959, the new compliance officer John Immel, was assigned the Rutter Rex case. His investigation of the compliance by Rutter Rex was, in effect, an investigation anew requiring him to begin with the most basic steps necessary to ascertain the sufficiency of the company's compliance. He commenced by contacting the claimants in order to interview them for purposes of evaluating their claims. During his assignment Immel interviewed approximately 30 alleged claimants. In his letter of March 22, 1960 (Exhibit 13) Immel stated that the last correspondence from the company was on September 11, 1957 and he requested access to various company personnel records. After being informed of same by company counsel, Immel found the letters of October 24, October 20 and November 9, 1957 and acknowledged same on April 7, 1960. (Exhibit 16). Thereafter, the Company

agreed to permit Immel access to its records and he commenced his review of same on April 26, 1960. (Exhibits 17, 18, 19). Were he called to the stand, Immel would testify that he had no personal knowledge that the Rutter Rex case had been deliberately given secondary priority but if this occurred, in his experience, this would have been unusual because backpay cases cause a sense of urgency and should be handled concurrently, if more than one is awaiting compliance. On June 10, 1960 Immel's assignment ended because he was promoted to another position. The case was then assigned on June 10, 1960 to acting Compliance Officer Loren Jones to continue the investigation. Most of the contracts with claimants, taking of affidavits and statements and obtaining authorization for release of Social Security information was accomplished after this date through November, 1961.

## XXV.

Were Jones called to testify, he would state that in his estimation, upon receiving the case assignment, approximately 20 to 25 percent of the investigation had been completed. On November 7, 1960, an attorney, Gilbert Cohen, was assigned full time to assist Jones. On October 12, 1961, another attorney, Hobart Hector, was assigned full time to assist Jones. On December 19, 1961 an attorney, Louis Fusilier, was assigned on a part time basis to assist Jones and Hector. Were he called to testify, Paschal would state that only by the Assignment of Cohen or other attorneys on an exclusive basis to handle this case was it possible to get the information necessary to prepare the backpay specification. Cohen worked on the case until his resignation from the agency.

## XXVI.

Cohen's initial activity was to request on December 2, 1960 access to substantially the same records Immel had previously inspected. (Exhibit 20). This request was also honored by the company who met with Jones and Cohen on December 14, 1960. Additional review of records occurred on December 19 and 20, 1960. On April 19, 1961, Cohen wrote to company counsel requesting to examine and microfilm numerous records on May 1, 1961. (Exhibit 21). This letter was acknowledged April 25, 1961. (Exhibit 21A). On May 17, 1961, company counsel wrote to Cohen suggesting an alternative method for gathering the information and, after noting the delay of the Board, and the prior instances where information about compliance was furnished, stated that the company was in compliance. (Exhibit 22). This letter was responded to on May 25, 1961 by LeBus who insisted on the microfilming technique and who stated that the delay in the case had been due to the fault of the company. LeBus threatened contempt proceedings. (Exhibit 23). On June 1, 1961, company counsel addressed a further response to LeBus setting forth the company's views on what had transpired with regard to the production of records and the delay. The company offered again to make all records available but denied the request to microfilm (Exhibit 24). If called, Jones and Cohen would testify that after receipt of Exhibit 24 they went to the company office on a number of occasions and there abstracted company records in longhand.

## XXVII.

Annexed as in globo Exhibit 25 is a packet of correspondence reflecting further contacts between the Board and the company or its counsel from June 26, 1961 through October 27, 1961.

## XXVIII.

Annexed hereto as in globo Exhibit 26 is a packet of correspondence and attachments indicating certain additional activities on the case of Board personnel during the period April 21, 1961 through September 29, 1961.

## XXIX.

On November 4, 1961, the Board filed the initial backpay specification against

Rutter Rex claiming $342,000 in backpay liability to 207 claimants. (Exhibit 27). On November 16, 1961, the Board wrote to counsel for Rutter Rex as follows:

"I wish to call your attention to paragraph IV, B of the Backpay Specifications and Notice of Hearing in the above-captioned cases. As you will note, it is our contention that the employees named therein have never been properly reinstated in accordance with the Board Order and Court Decree. As a result of this, backpay is still accruing for those named individuals and until a proper offer of reinstatement is made to each of them, no final computation of backpay due can be made with respect to these employees. Such an offer would toll any further liability which might arise based on our contentions." (Exhibit 27A).

On December 30, 1961 Rutter Rex filed a motion in the Fifth Circuit Court of Appeals seeking to enjoin the Board from further proceedings on the ground of the Board's delay of more than four years in filing the backpay specification after the Court's enforcing opinion of June 10, 1957. On January 3, 1962 the Fifth Circuit ordered a temporary stay of all proceedings. After briefing and argument on the merits the Fifth Circuit refused permanently to enjoin the backpay proceedings in an opinion issued July 19, 1962, in which the Court noted that the proceedings were subject to further judicial review after completion before the Board. (305 F.2d 242.) After denial of rehearing on August 28, 1962, the company's answer to the initial backpay specification was filed with the Board on September 4, 1962. The hearings before a Board Trial Examiner commenced on November 13, 1962 and ran over the course of the next several months, a total of 58 trial days. 6,573 pages of testimony were accumulated and hundreds of exhibits. The hearings closed on September 30, 1963.

### XXX.

During the hearings, by the legal rules applicable, the burden of proof was upon Rutter Rex to establish by competent evidence facts which would mitigate backpay liability, such as, evidence supporting recognized defenses that particular employees failed sufficiently to seek interim employment with employers other than Rutter Rex during the backpay periods, that claimants incurred willful losses of earnings, that claimants were out of the labor market for one reason or another, that claimants had voluntarily terminated their employment relationship with Rutter Rex, and the amount of interim earnings received by claimants during their backpay periods which properly was to be credited against gross backpay liability, if any. Repeatedly, when cross-examined, many claimants stated that they were unable to recall important facts and information relevant to these defenses. In this regard, claimants were being questioned about their activities during the period from the end of the strike in April, 1955 through the termination of their respective backpay periods. Further, many claimants could not produce documents which had been lost or destroyed prior to the time of the hearing. Defendant canvassed other needle trade employers in the New Orleans area in an effort to check out the stories of many if not most of the claimants that they sought interim employment with these employers. Due to the passage of time, most such employers had either lost or destroyed their records and Rutter Rex was unable to check out the witnesses' testimony. (Exhibit 27B). Due to the passage of time, the court reporters' shorthand notes in the matter of J. H. Rutter Rex Manufacturing Company, Inc. v. J. H. Youndahl, et al., No. 333-832 on the docket of the Civil District Court for the Parish of Orleans, referred to in company counsel's letter of October 27, 1961 (part of Exhibit 25) were destroyed, could not be transcribed and, therefore, could not be introduced or referred to during the Board hearing. The referenced Civil District Court action was a suit to enjoin strikers and union members and officials from engaging in violence to persons and prop-

erty. The testimony was relevant to the company's defense, raised as to 15 claimants, that their reinstatement rights had been lost due to improper strike conduct. (See also affidavit of Eugene J. Rutter dated January 31, 1962—Exhibit 27C). To the extent that evidence relevant to the issue of mitigation of backpay liability was available, it was introduced by Rutter Rex during the 1963 backpay hearings and was duly considered by the Board. The details of the lost evidence referred to above are unknown to the parties. Had such evidence been favorable to Rutter Rex's position on the issue of mitigation of backpay liability, it also would have been duly considered by the Board.

### XXXI.

The following dates and events are taken from the pretrial order with respect to significant occurrences in the case subsequent to the close of the initial backpay hearings on September 30, 1963 and have been supplemented to bring them current.

6/2/64—Trial examiner's supplemental decision awarding $160,894.69 in aggregate backpay;

6/3/66—Decision of NLRB substantially affirming all of trial examiner's decisions;

6/8/66—Petition for review filed by plaintiff in Fifth Circuit;

7/14/66—Board's answer to petition for review filed in Fifth Circuit;

7/15/66—Petition for review filed in Fifth Circuit by Union;

9/9/66—Board's motion to Fifth Circuit to consolidate case;

9/26/66—Fifth Circuit order of consolidation;

12/7/67—Oral argument before Fifth Circuit on original specification;

7/23/68—Fifth Circuit Opinion on original specification modifying Board order and cutting off all backpay liability as of July 1, 1959 on account of the Board's delay, J. H. Rutter Rex Manufacturing Company, Inc., 115 NLRB 383 (1956);

8/26/68—Fifth Circuit judgment entered;

8/26/68—Board's petition for rehearing filed in Fifth Circuit;

10/1/68—Fifth Circuit order denying Board and Union petitions for rehearing;

1/9/69—Board petition for certiorari filed with U. S. Supreme Court;

1/16/69—Plaintiff's (Rutter Rex) petition for certiorari filed in U. S. Supreme Court;

3/3/69—Orders issued by the Supreme Court granting Board's and denying plaintiff's petition for certiorari;

12/15/69—Opinion of Supreme Court reversing Fifth Circuit opinion, NLRB v. J. H. Rutter Rex Manufacturing Co., 396 U.S. 258, 90 S.Ct. 417, 24 L.Ed.2d 405 (1969);

1/7/70—Plaintiff's petition for rehearing filed in Supreme Court which rehearing was denied;

11/30/70—Supplemental backpay specification filed claiming additional backpay of $54,551.00;

6/23/71—Trial examiner's second supplemental intermediate decision issues on supplemental backpay claims;

11/5/71—Supplemental order of NLRB affirming trial examiner;

11/12/71—Company petition to Fifth Circuit for review of Board's order on supplemental proceedings;

12/27/71—Cross application for enforcement filed in Fifth Circuit by NLRB;

1/16/73—Opinion of Fifth Circuit enforcing Board's order on supplemental backpay specification; J. H. Rutter Rex Manufacturing Company, Inc. v. NLRB, 473 F.2d 223 (5th Cir. 1973);

3/12/73—Fifth Circuit's order denying timely petition for rehearing en banc filed by plaintiff;

3/20/73—Judgment of the Fifth Circuit entered as the mandate of the Court;

5/7/73—Timely petition for a writ of certiorari filed by plaintiff with respect to supplemental backpay claims in U. S. Supreme Court;

6/13/73—Memorandum in opposition to petition for writ of certiorari filed in U. S. Supreme Court by NLRB;

10/9/73—Certiorari denied by U. S. Supreme Court;

4/10/73—Remand hearing with respect to claim of Fannie Watford.

## XXXII.

A breakdown of the backpay claims and their handling subsequent to the filing of the initial specification is as follows:

*Initial Backpay Specification*—This document brought backpay claims on behalf of 207 claimants for the period commencing five days after the termination of the strike through the end of the second quarter of 1961 (June 20, 1961). The Board chose the latter cutoff date for convenience in drafting and filing the specification on November 4, 1961.

*Supplemental Backpay Specification* —Thirty-three claims were alleged by the Board to have run beyond the cut-off date of the initial specification, that is, beyond June 30, 1961. These claims were brought by the Board in the supplemental backpay specification filed November 30, 1960 and covered backpay allegedly due to claimants for the period July 1, 1961 through May, 1963 with six claims extending to various dates beyond the latter date. The reason for the cutoff of most claims in May, 1963 is that during the hearings on the initial specification, the company tendered reinstatement to the claimants whose claims were allegedly still accruing either by letter or orally when the claimant took the witness stand with the exception of the 15 claimants against whom the company had asserted the defense of improper strike conduct. Of the six claims which ran beyond May, 1963, four fell into the misconduct category and two were apparent oversights or cases where the evidence with respect to compliance could no longer be produced.

## XXXIII.

The total amounts paid by Rutter Rex under the two specifications are as follows (interest was awarded from June 2, 1964):

| | Backpay | Interest | Total |
|---|---|---|---|
| Original Specification | $119,790.68 | $41,806.97 | $161,597.65 |
| Supplemental Specification | $ 53,079.00 | $28,532.65 | $ 81,611.65 |

Annexed as Exhibit 28 is a summary of the backpay and interest paid for each calendar quarter commencing with the third quarter of 1957 (the next quarter after the Circuit Court enforcing opinion) through the termination of all claims included in the supplemental specification. Of the initial total of 207 backpay claimants, 161 received awards. Of the latter number, the claims of 123 terminated at various times prior to the end of the second quarter of 1957. Thirty-eight claims extended beyond July 1, 1957, thirty-three of these beyond June 30, 1961 and 6 of these beyond May, 1963. Thus, the dollar amounts shown on Exhibit 28 reflect the awards to no more than thirty-eight claimants.

## XXXIV.

It is further stipulated that the parties to this proceeding may refer to any deposition taken herein and on file herein for any purpose.

## XXXV.

It is further stipulated that the parties hereto may refer for any purpose to

the official record of any proceeding before the Board or the Courts involving J. H. Rutter Rex Manufacturing Company, Inc. as a party, subject to the requirement that it shall be the responsibility of the party referring to the portion of any such record which is not already a part of the record herein, to reproduce and provide copies of the portion so referred to for the use of the Court and the other party.

### XXXVI.

Pursuant to 28 U.S.C. § 2675, plaintiff presented its claim to defendant on July 22, 1960 and defendant denied same.

January 31, 1974
(s) Henry J. Read

    Henry J. Read
(s) Daniel Lund

    Daniel Lund
    MONTGOMERY, BARNETT, BROWN & READ
    806 First National Bank of Commerce Building
    New Orleans, LA 70112
    (529–5051)
    Counsel for plaintiff, J. H. Rutter, Rex Manufacturing Company, Inc.

January 31, 1974
(s) James Carriere

    Gerald J. Gallinghouse
    United States Attorney
    by James D. Carriere
    First Assistant United States Attorney
    500 St. Louis Street
    New Orleans, LA 70130