**Timothy D. THOMPSON, Plaintiff,**

v.

**Jo Anne B. BARNHART,[1] Commissioner of Social Security, Defendant.**

**No. 3–01–CV–90118.**

United States District Court, S.D. Iowa, Davenport Division.

May 24, 2002.

Michael DePree, Davenport, IA, for Plaintiff.

Gary L. Hayward, Assistant U.S. Atty., Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Timothy D. Thompson, filed a Complaint in this Court on September 12, 2001, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title XVI[2] of the

---

**1.** Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section

205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**2.** Plaintiff initially filed for benefits under both Title II and Title XVI of the Social Security act. December 22, 1993. Tr. at 158–61. At the administrative hearing on May 9, 1995, Plaintiff withdrew his application for Title II benefits. Tr. at 25.

Social Security Act, 42 U.S.C. §§ 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and the Commissioner is ordered to award benefits.

## PROCEDURAL HISTORY

Plaintiff filed an application for benefits on December 22, 1993[3]. Tr. at 154–57. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. On May 9, 1995, a hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ). The ALJ issued a Notice Of Decision—Unfavorable on September 29, 1995. Plaintiff requested review by the Appeals Council on October 5, 1995. Tr. at 353–55.

In a letter dated April 28, 1997, after having written three follow-up letters to the Appeals Council, counsel stated that if a decision had not been rendered within one month, he would file a Complaint in Federal Court "claiming that exhaustion of administrative remedies appears to be a futile requirement in this case." Tr. at

361. Thereafter, on October 3, 1997, Plaintiff sought judicial review in the United States District Court for the Southern District of Iowa. *See* Clerk's Docket for case 3:97–cv–10181. On February 5, 1998, the Commissioner moved the Court to dismiss the case for lack of subject matter jurisdiction. *Id.* at docket entry 6. In a responsive pleading filed February 19, 1998, Plaintiff did not contest the remand, but requested that the Court instruct the Appeals Council to assign the case to a different ALJ who, Plaintiff claimed, was biased in her decision-making. *Id.* at docket entry 8 and Tr. at 366. On March 16, 1998, the Court, Hon. Ronald E. Longstaff, filed an order granting the Commissioner's motion to dismiss and declining to "assume such an active role in a case in which [the Court] lacks subject matter jurisdiction[4]." *Id.* at docket entry 9 and Tr. at 366–67.

On January 26, 1999, Plaintiff appeared at a hearing before the ALJ. Tr. at 81–123. The ALJ issued a Notice Of Decision—Unfavorable on February 24, 1999. Tr. at 22–49. Plaintiff requested review by the Appeals Council on March 2, 1999. Tr. at 18–21. On August 28, 2001, the Appeals

---

3. While living in the state of Texas, Plaintiff filed an application for benefits on March 10, 1989. This application was denied at the reconsideration stage on August 23, 1989. Tr. at 278–93. A prior determination may not be reopened more than 2 years after the date of the initial determination. 20 C.F.R. § 416.1488(b).

4. The parties in this case should be aware that the Court has read the correspondence between counsel and the ALJ which followed the Court's Order dismissing the case. No purpose will be served by attempting to accurately summarize each of the letters. Nor, would the parties themselves be well served by such an effort. All concerned, however, should know that in spite of the fact that the result of this case is a reversal with an order to award benefits, this Court is not impressed with the unfounded allegation of bias made

several times in this case against Judge Ingrassia. Likewise, neither counsel's charge nor this reversal diminishes the high regard in which this Court holds Judge Ingrassia.

Finally, the Court is not unsympathetic to counsel's frustration with the length of time this case sat at the Appeals Council. The Court is reminded of *J.H. Rutter Rex Manufacturing Company, Inc. v. National Labor Relations Board,* 473 F.2d 223 (5th Cir.1973), a case that took "eighteen long years of judicial journeying" before Judge Goldberg was able to write that the Court was "hopeful that precedent, logic, and law, here merging with common sense, will enable us to write *finis* to this elongated contretemps." *Id.* at 243. "Having uttered [a] novena for speed," Judge Goldberg concluded, "... we deplore the delay, but we would not substitute one hour of efficiency for one moment of justice." *Id.*

Council declined to review the ALJ's decision, making that decision the final decision of the Commissioner. Tr. at 7. Complaint was filed in this Court on September 12, 2001.

## MEDICAL HISTORY

### FIRST ALJ HEARING EVIDENCE

On April 27, 1984, Plaintiff was seen at an emergency room of Brackenridge Hospital in Austin, Texas, with laceration to the fourth and fifth fingers of his left hand. Tr. at 201. Plaintiff was seen again at the emergency room on July 30, 1984 after he mangled the 3rd, 4th and 5th fingers of his right hand in a forklift accident. Tr. at 202. The tips of the 3rd and 4th fingers were amputated. Tr. at 205. The laceration to the fifth finger was sutured. U. Gadaria, M.D. wrote that four to six weeks of disability could be expected. Tr. at 206. A discharge summary from The Therapy Center in Austin, Texas dated September 26, 1984 (Tr. at 208–09) states: "At 8 weeks postop his hand was completely healed." Ann Givens, O.T.R. wrote that the strength and pinch were within normal limits and range of motion was only slightly limited due to some scar tissue on the fingertips. Plaintiff was released to return to work as of October 1, 1984. Tr. at 209. On May 2, 1985, Dr. Gadaria performed a surgery on Plaintiff's left hand, apparently to repair damage done when Plaintiff lacerated his hand in 1984. Tr. at 210–11.

On July 12, 1986, Plaintiff went to Brackenridge Hospital complaining of left earache. A bilateral mastoid x-ray series did not show any evidence of acute or chronic mastoiditis. Tr. at 212–20. On January 9, 1990, Plaintiff went to the hospital after being hit with a fist on his right cheek. He was treated with an ice bag. Tr. at 221. An x-ray did not show any fracture. Tr. at 223.

Plaintiff, who had moved to Davenport, Iowa, was seen by Larry Standing, M.D. (Tr. at 2) on December 15, 1993 for low back pain. Plaintiff said that he had the back pain for one and a half years after he fell on his back while playing frisbee, but had not seen a doctor before. Plaintiff told the doctor that two years before he fell off a swing. Plaintiff also complained of a headache for one week which he described as pressure behind his eyes and which the doctor diagnosed as sinusitis. The doctor ordered x-rays of Plaintiff's lumbar and cervical spine. Tr. at 226. The x-rays of the cervical spine were negative and the lumbar x-rays showed evidence of spondylolysis[5] at L–5 bilaterally. Tr. at 227. Plaintiff was prescribed vicodin, flexeril and ibuprofen. Tr. at 228. Dr. Standing's entry dated January 5, 1994, states that the week before, Plaintiff had fallen down six steps and landed on his back. That note also states that Plaintiff had begun physical therapy (see Tr. at 230). Tr. at 227 & 229. On January 19, 1994, Plaintiff reported that his back felt "not too bad." Tr. at 229.

On January 26, 1994, Plaintiff was seen by Peter C. Rink, D.O. at the request of Dr. Standing. Dr. Rink noted that the x-rays of Plaintiff's back had been normal other than the spondylolysis, but that Plaintiff understood that to mean that he had a break in his back. At the time of Dr. Rink's examination, Plaintiff was 32 years old. Plaintiff admitted to drinking a

---

5. Degeneration or deficient development of a portion of the vertebra; commonly involves the pars interarticularis, which can result in a spondylolithesis. [spondylo+ G. lysis, loosening]. Stedman's Medical Dictionary, 27th Edition.

PARS INTERARTICULARIS: the segment of bone between the superior and inferior articular facets, especially in the lumbar spine. *Id.*

12 pack of beer per week. On physical examination, Dr. Rink wrote:

> When I palpate his back I find no soft tissue tenderness or abnormality. Even so, he tells me [he] has pain and when he walks he grabs his back and winces on occasions. These displays seem very inconsistent. He is able to forward bend and touch his toes. Backward bending was full as was side-bending. He toe walks and heal walks without difficulty. In the seated position sensory and motor exam was unremarkable with deep tendon reflexes 2/4 for patellar and Achilles'. Straight leg raising is negative. No other abnormalities are noted.

Tr. at 234. When Dr. Rink looked at the x-rays taken at the hospital, he said that the quality was poor. The doctor took his own x-ray of Plaintiff's back and wrote: "I would say that I do not see a [spondylolysis] and I do not see it on the obliques from the hospital." Dr. Rink said that he wanted to obtain a CT scan to make a final determination but that he tried to reassure Plaintiff that even if he does have a pars defect that treatment would be conservative. The doctor wrote that it would be unlikely that any surgical treatment would be indicated. Finally, Dr. Rink wrote: "My impression on this initial visit is that I do not find him highly motivated to return to employment." Tr. at 235. The report of the CT scan taken January 31, 1994, is a very poor photo copy and difficult to read. Nevertheless, it appears to report mild bulging of the L4 disc, a small central protrusion of the L5 disc, and early arthritic changes of the low back. The last word on the report appears to be spondylolysis, but the words before it are completely obliterated. Tr. at 237.

On April 20, 1994, Plaintiff returned to Dr. Standing complaining of low back pain and migraine headaches. Dr. Standing was aware of Dr. Rink's interpretation of the CT scan. The doctor prescribed ibu-profen 800 mg, flexeril, heat, and exercises. Tr. at 275. When Plaintiff saw Dr. Standing on May 10, 1994, Plaintiff was taking GED classes but his low back pain was making it difficult for him to sit through the classes. Plaintiff requested and was given a note excusing him from class until his back pain resolved. Tr. at 276.

Plaintiff was seen for a psychological evaluation at the request of Disability Determination Services by Elizabeth Lonning, Psy.D. on February 22, 1994. Tr. at 238–43. When asked to talk about his medical problems, Plaintiff began by telling of problems with his birth. Tr. at 238. When he was young, Plaintiff's brother hit him over the head with a board, to which Plaintiff attributed a history of migraine headaches. When Plaintiff was 16 years old, he put his arm through a window and required extensive tendon repair on his left hand as a result of which he does not have full dexterity or complete feeling in the left hand. *See* Tr. at 294. Approximately six months before the evaluation, Plaintiff and his family had moved from Texas to Iowa. Regarding his education, Plaintiff said that he had been in special education since the 3rd or 4th grade and had dropped out in the 8th grade. Plaintiff said that he was told that he had dyslexia, and said that behavior was a frequent problem in school. Tr. at 239. Plaintiff reported significant psychiatric history in various members of his family. The psychologist wrote:

> Mr. Thompson has a significant history for alcohol and drug abuse. Mr. Thompson states that at age 9 or 10, he stole a fifth of vodka from his parents' house while the family was living in California and went to a party. The police crashed the party and wrote him up for being under the influence and in possession of an alcoholic substance as a minor. This was his first scuffle with

the law and his first taste of drinking. Due to his father's severe reaction, Mr. Thompson states he did not drink again until the family moved to Austin, Texas at approximately the age of 13. At this time, he began drinking beer and whiskey. He states that he would drink at least a fifth of whiskey when he would drink. In addition, Mr. Thompson stated that he would take almost any kind of drug he could get his hands on. The incident when he was 16 where he put his arm through a window occurred after he had been drinking heavily and taking some of his mother's Valium. Mr. Thompson states that he use to drink approximately one case of beer a day, but that money has become a problem and he is, therefore, unable to spend as much money on alcohol as he use to. Currently, Mr. Thompson states he does not take any illicit drugs (nor medication) and drinks approximately two to three times a week. He drinks until all the alcohol he has purchased is gone, which is approximately anywhere from six to twelve beers. When asked if he thought that alcohol was currently a problem for him, he stated "I don't think I'm addicted now or anything. I think before, when I was drinking a case a day, it was a problem, but not now." Mr. Thompson had another arrest when he was 19 years old. In June of 1980, while he was working in Arizona, he was drinking and purchased a fifth of Jack Daniels. The bar closed and he headed to his hotel with the fifth, when he saw a Suburban parked along the road with keys in it. Before he knew it, he had run into a telephone pole. Mr. Thompson states that at that time, he was arrested for a DUI and a felony charge for stealing the Suburban. He spent 18 months in jail in Fort Grant, Arizona. He denies any other legal trouble.

On the Wechsler Adult Intelligence Scale–Revised (WAIS–R), Plaintiff scored a verbal IQ of 73, a performance IQ of 73 and a full scale IQ of 72. Tr. at 241. The psychologist opined that Plaintiff's limited educational history, his history of excessive alcohol usage, and his impaired ability to use his dominant hand, may all have impacted on his IQ scores. Nevertheless, the scores did not show a significant discrepancy between the verbal and performance scales suggesting equal ability in both skill areas. Although the reproductions on the Bender Motor–Visual Gestalt were difficult for Plaintiff due to the problems with his left hand, the test did not show any organicity. Tr. at 242. The psychologist made the following observations: Although Plaintiff endorsed hearing voices and seeing images in trees, his mental status was intact; Plaintiff did not demonstrate any difficulty remembering or understanding instructions, procedures or locations during the testing; Plaintiff did not demonstrate any difficulty maintaining attention or concentration although pace was limited due to dexterity problems with his left hand; while Plaintiff was able to interact with the psychologist, his history of legal problems might suggest problems with supervisors, co-workers and the public in job situations; Plaintiff's history was significant for an inability to exercise good judgment; Plaintiff stated that if he had more money, he would drink more; Plaintiff did not present any history of difficulty managing finances but his statements regarding alcohol suggested questionable ability in this area. Tr. at 243.

Plaintiff was seen by Steven Chang, M.D. at Vera French Community Mental Health Center on August 26, 1994. Tr. at 257–58. Plaintiff said that he was having a hard time coping with his physical and mental problems. Plaintiff noted his dyslexia, lack of education, inability to read or write well, and problems with his left hand which make it impossible for him to do construction work. As a result Plaintiff

said that he was feeling depressed, irritable and short-tempered. Tr. at 257. Dr. Chang noted that Plaintiff's father was a writer for television advertisements. Plaintiff was observed to be alert, oriented to time, place and person, but he was very tense and nervous as well as depressed. Dr. Chang diagnosed dysthymic disorder and "rule out major depressive disorder." Prozac was prescribed. Dr. Chang also wrote that a chronic pain disorder needed to be ruled out. Tr. at 258.

On January 13, 1995, Dr. Chang completed a mental residual functional capacity questionnaire. Tr. at 265–69. On this form, the term "moderate" is defined as: "An impairment which significantly affects, but does not preclude, ability to function." Tr. at 265. The following items were circled as being moderately impaired: Estimated degree of restriction of daily activities—ability to attend meetings (church, lodge, etc.) work around the house, socialize with friends, neighbors, etc. (Tr. at 265); Estimated degree of constriction of interests of the patient; ability to remember work-like procedures; ability to maintain attention for extended periods of 2 hour segments (Tr. at 266); ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being unduly distracted by them; ability to complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes (Tr. at 267). Dr. Chang said that the foregoing limitations could be expected to last for 12 months or longer. Tr. at 268.

On May 30, 1995, Dr. Chang wrote to the ALJ in response to her letter of May 22, 1995. According to Dr. Chang's letter he responded directly to four interrogatories from the ALJ. First, the doctor stated that he had personally seen and evaluated Plaintiff on August 26, 1994, at which time he diagnosed dysthymic disorder and rule out major depressive disorder. Secondly, Dr. Chang stated that he had seen Plaintiff on three other occasions after his initial evaluation—September 19, October 14, and November 11, 1994. Third, Dr. Chang wrote that Plaintiff was currently being treated by Thomas Garside, M.D. Tr. at 308. In response to the fourth question which asked for the clinical basis for his opinion regarding the moderate limitations, Dr. Chang wrote:

Per the clinical history, Mr. Thompson is a man who has significant anger, difficulty relating to others, a tendency to isolate himself, as well as fluctuating moods and severe migraines. As a result, he experiences periods of depression and crying, episodes of anxiety, difficulty concentrating, and is often irritable and short tempered. Further complicating the situation is a history of dyslexia, coupled with an education no further than the eighth grade.

As a result of the above difficulties, Mr. Thompson would very probably encounter problems in the area of social functioning, as well as sustained concentration and memory, as noted in the responses on the questionnaire. He was rated as moderately limited because these impairments significantly affect, but do not preclude, Mr. Thompson's ability to function in those areas noted.

Tr. at 308–09.

On May 8, 1995, Plaintiff was seen by Dr. Garside after Plaintiff requested a change of physicians "citing failure to im-

prove, and irrevocable conflict." Dr. Garside noted that Plaintiff had not been compliant taking his Prozac since January of that year. It was noted that Plaintiff was scheduled for a psychological evaluation for adult ADHD. Plaintiff told Dr. Garside that he was unable to work due to chronic pain, an inability to sleep, because he had become more withdrawn, easily frustrated and becomes enraged. Plaintiff mentioned his Social Security hearing the next day and said that he hoped to obtain retraining in some occupation he could do in spite of his physical injuries. Plaintiff denied using illegal drugs but said that he drinks six to twelve beers per week. Plaintiff denied anergia[6], anhedonia[7], or appetite disorder. Tr. at 320. The doctor noted that Plaintiff's brother and mother, who are both chronically mentally ill, live with Plaintiff and his wife and children one of whom suffers from fetal alcohol syndrome. On mental status exam, Dr. Garside wrote:

The patient was clean, and fairly neatly groomed. He had long hair, tied in a bun in the back, and was bearded. He presents as quite tense with tremors, his palms are sweating, and had pressured, anxious speech. His fingernails were bitten down. He is oriented times three, and he has no delusional or hallucinatory symptoms. He focuses on his poly system medical problems, and his various disabilities, and inadequacy to cope. He perceives expectations as excessive. He does not relate in the manner of feeling himself a victim of unfair expectations and a lot of anger at the system for their deprivation and mistreatment, and so forth, as we frequently see in a case like this. He talks about his Dyslexia, his ADHD, his insomnia, his crying spells, his confusion, and getting lost a lot, and so forth. He ques-

tions if he has a chemical imbalance like his mother and brother. He feels disabled by his allergies as well. He does not appear to me to be directly manipulative or suspicious. He, perhaps, is ingratiating and seems somewhat urgent to have his problems addressed, "I'm ready for change, things have to get better. Yet, I know that things could always get worse." He states that he is able to read and understand, and was given a Millon. He claims he cannot spell or write as well as he can read.

Dr. Garside's Axis I diagnoses were generalized anxiety disorder, moderately severe, and Attention Deficit Hyperactivity Disorder by history. Tr. at 321. Dr. Garside left Plaintiff off Prozac and ordered an EEG and CT-scans of Plaintiff's head with and without contrast. Tr. at 322. The CT-scan taken on May 15, 1995, did not show any area of abnormally altered attenuation, mass or mass effect. The ventricles and basilar cisterns were normal. The exam was reported as being normal. Tr. at 318. The Court does not find the report of the EEG, but the report of the CT scan states that the reasons for the CT scan was an abnormal EEG as well as severe headaches. A hand written treatment note from Vera French Community Mental Health Center dated June 13, 1995, which is difficult to read, appears to state that an EEG was abnormal. Tr. at 569.

### ALJ'S FIRST DECISION

On September 29, 1995, the ALJ issued a Notice Of Decision—Unfavorable. Following the sequential evaluation (20 C.F.R. §§ 404.1520(a)-(f)); *see also, Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987 (describing the five-step analysis)), the ALJ found that

---

**6.** Lack of energy. Stedman's Medical Dictionary, 27th Edition.

**7.** Absence of pleasure from the performance of acts that would ordinarily be pleasurable. *Id.*

Plaintiff has not engaged in substantial gainful activity since December 22, 1993. The ALJ found that Plaintiff's severe impairments are: a history of right hand injury with amputation of the third and fourth fingertips, a history of left hand injury, degenerative arthritis, a borderline intellect, a dysthymic disorder, and a history of alcohol/drug abuse. The ALJ found that none of the impairments, or combination of impairments, meet or equal the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4. Tr. at 338. The ALJ found that Plaintiff is unable to return to his past relevant work. The ALJ found that Plaintiff has the residual functional capacity to lift 25 pounds maximum and 20 pounds frequently; to sit, stand/walk six hours of an eight hour day with the ability to alternate sitting and standing. The ALJ found that Plaintiff has some limitation of manipulation of the right hand. Mentally, the ALJ found that Plaintiff retains a moderate ability to understand, carry out and remember instructions; to respond appropriately in occasional contact with supervisors, co-workers, and the public and to make simple work-related decisions; and to deal with changes in a routine worksetting. The ALJ found that the residual functional capacity allowed for the performance of work such as cleaner-housekeeper, flagger-construction, and buffing machine tender. Tr. at 339. The ALJ found that Plaintiff was not under a disability or entitled to the benefits for which he had applied. Tr. at 430.

## MEDICAL HISTORY

### SECOND ALJ HEARING EVIDENCE

Plaintiff saw James Gilliland, D.O. whose practice is limited to allergy and clinical immunology, on November 29, 1995, on referral from Charles Elmendorf, D.O. Tr. at 381–82. Plaintiff complained of itching and tearing of the eyes, nasal stuffiness, rhinorrehea and sneezing. Plaintiff said that he had these symptoms since childhood but that they were worse from spring through fall. Plaintiff told the doctor that he had taken shots when he lived in California. Plaintiff also said that he was taking Depakote for abnormal brain waves that had been diagnosed by Dr. Garside. In addition, Plaintiff reported symptoms which the doctor said were suggestive of sleep apnea. Tr. at 381. Skin testing was "consistent with allergic rhinitis-conjunctivitis with mites, danders, pollens and possibly the molds being the most likely significant inhalant allergens." Dr. Gillilland prescribed medication. Tr. at 382. When Plaintiff was seen on January 2, 1996, he told the doctor that the medication had provided significant improvement. Because Plaintiff indicated that he would be moving from the area within the next two years, the doctor did not recommend immunotherapy. Tr. at 380. On February 12, 1996, the doctor noted that Plaintiff had decided that he wanted to begin taking shots, so arrangements were made to do so. A handwritten notation on May 30, 1996, states that Dr. Garside had prescribed Tegretol. On November 10, 1997, Dr. Gillilland wrote that Plaintiff was having good control with injections only and that Plaintiff had stopped taking the antihistamine prescribed because he had been told that it would interfere with the Tegretol. Tr. at 379.

Plaintiff saw Charles F. Elmendorf, D.O. on May 19, 1995, for back pain, most severe in the cervical spine but extending into the lumbar area. Plaintiff described the pain as aching with a severity of 5 on a scale of 1–10. Plaintiff was described as a well developed, well nourished patient in no acute distress. Tr. at 500. After an osteopathic examination (Tr. at 500–501), the doctor's diagnoses were: Back pain, unspecified; somatic dysfunction thoracic; somatic dysfunction lumbar; and, somatic

dysfunction cervical acute. The doctor provided osteopathic manipulation which provided decreased pain and increased range of motion. Plaintiff was also prescribed parafon forte and motrin 800 mg. Tr. at 501. Plaintiff saw Dr. Elmendorf on numerous occasions thereafter mostly for pain in his back but also for other problems for which one sees a family physician including allergies. On October 30, 1995, Dr. Elmendorf made an appointment for Plaintiff to see Dr. Gilliland. On September 26, 1995, Plaintiff saw Kevin W. Blechle, D.O. for heart palpitations. Tr. at 481–82. On examination, the heart had a rate and rhythm. Tr. at 481.

On October 10, 1996, cirrhosis was added to the list of diagnoses. Tr. at 449. Plaintiff was instructed to stop drinking all alcohol and to eat a low fat diet. Tr. at 450. On January 27, 1997, hepatitis, unspecified was added to the diagnoses. Tr. at 444. An appointment was made for Plaintiff to see William Davidson, III, M.D. Tr. at 445. On February 19, 1997, Plaintiff underwent an liver biopsy which showed a mild increase in hepatocellular iron. The findings were not suggestive of hemochromatosis[8], there was no evidence of cirrhosis and the study was not suggestive of an infectious hepatitis. Tr. at 390 & 556.

Plaintiff was seen for a physical examination by Thomas J. Hughes, M.D. on September 24, 1998. Tr. at 529–40. Plaintiff told Dr. Hughes that in addition to his other medical problems he has a partial complex seizure disorder and migraine headaches. During the seizures, Plaintiff becomes confused and disoriented. Plaintiff could not tell Dr. Hughes the frequency or duration of the seizures, although he thought they may occur daily. Plaintiff said that he gets migraines two or three times a week and that severe headaches are associated with fuzzy vision and flashing lights. Plaintiff said that he takes no medication for the headaches but that he takes Tegretol for the seizures. Plaintiff also reported his chronic back pain. Tr. at 529. Plaintiff discussed a history of problems with a dislocated vertebra in his neck at age 7; the laceration of his left hand; laceration of his left forearm; an injury to his right knee at age 13; amputation of the tips of his fingers; and, dyslexia. Tr. at 530. On physical examination, Plaintiff's heart rate was in excess of 120 beats per minute. Dr. Hughes wrote: "The patient is extremely anxious during the early course of the interview. He has a lot of pressure of the speech and he was noted to be sweating quite profusely." Plaintiff became more comfortable during the latter part of the examination. Tr. at 531. After the physical examination (Tr. at 531–33), Dr. Hughes wrote that Plaintiff "probably does have several problems which are valid and probably also has several other complaints which are of dubious validity." The doctor opined that Plaintiff likely does have a partial complex seizure disorder. Regarding the headaches, the doctor wrote: "I am not certain whether these are migraine headaches. Certainly, he has some mild suggestion of scintillating scotomata[9], but no other features of classical migraine. He may simply suffer

---

8. A disorder of iron metabolism characterized by excessive absorption of ingested iron, saturation of iron-binding protein, and deposition of hemosiderin in tissue, particularly in the liver, pancreas, and skin; cirrhosis of the liver, diabetes (bronze diabetes), bronze pigmentation of the skin, and, eventually heart failure may occur; also can result from administration of large amounts of iron orally, by injection, or in forms of blood transfusion therapy. Stedman's Medical Dictionary, 27th Edition.

9. A localized area of blindness edged by brilliantly colored shimmering lights (teichopsia); usually a prodromal symptom of migraine. Stedman's Medical Dictionary, 27th Edition.

from muscular tension headaches." The doctor said that Plaintiff's low back complaints "are of very dubious validity" and that the back would not be a "substantially limiting problem." The doctor opined that Plaintiff's most problematic impairments are his limited intelligence and "very limited capacity for coping." "He seems to take a great deal of solace in having illnesses and medical problems that preclude him from working rather than trying to apply himself to useful and productive employment. But, he probably has very limited skills and obviously has a very bad safety record in the course of employment." The doctor opined that Plaintiff has the capacity for lifting and carrying moderate levels of weight, that his grasp strength in both hands is diminished, that there are no limitations as a result of his back, that he is capable of standing, moving about, walking, sitting, stooping, climbing, kneeling and crawling. Tr. at 533. The doctor also said that Plaintiff has diminished grip strength but has no impairment of vision, hearing or speech. Plaintiff has no cardio-pulmonary or other problems which would limit his ability to work in extremes of temperatures or other hazards. Tr. at 534. The doctor filled out a residual functional capacity report on which he opined that Plaintiff is able to lift and carry up to 100 pounds occasionally, 50 pounds frequently and 20 pounds continuously. Tr. at 537. Although Plaintiff's use of his hands is limited, the doctor said that Plaintiff can frequently do simple grasping and fine manipulation. The doctor also said that Plaintiff could sit, stand and walk for eight hours. Tr. at 538. The doctor said that Plaintiff can continuously climb, balance, stoop, crouch, kneel, crawl, reach push/pull, hear and speak. Tr. at 539. Finally, Dr. Hughes said that Plaintiff was not restricted from working around heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, fumes, or vibrations. Tr. at 540.

On September 28, October 12, and November 4, 1998, Plaintiff was seen for a psychological evaluation by Brenda J. Payne, Ph.D. Tr. at 541–49. Plaintiff attributed his problems following directions and getting along with people to his seizure disorder. Tr. at 542. Plaintiff said that his longest period of employment had been for three years at a company where his brother was the foreman. Tr. at 542. On mental status exam, Plaintiff denied any delusions or hallucinations. His thought content was focused on physical pain and financial worries. His insight into current difficulties and judgement appeared poor. The psychologist opined that the evaluation was a valid reflection of Plaintiff's current functioning. On the WAIS–III, Plaintiff scored a verbal IQ of 81, a performance IQ of 74, and a full scale IQ of 76. As in the previous IQ test, there was not a significant difference between the verbal and performance scores "indicating his verbal and nonverbal skills are roughly evenly developed." Tr. at 543. Plaintiff's scores on the Wechsler Memory Scale—3rd Edition, showed no deficits in memory skills. The Millon Clinical Multiaxial Inventory—II suggested that Plaintiff is suffering from serious symptoms of depression and anxiety. The test also showed personality functioning which is marked by chronic maladaptive coping. Tr. at 544. In summary, the psychologist wrote:

His personality functioning is marked by chronic psychological maladjustment. He suffers from symptoms of depression and anxiety, and has poor social skills. He is fearful of rejection, but is not motivated to change his behavior. He tends to be preoccupied with somatic symptoms. The test results indicate that Mr. Thompson's complaints of chronic memory problems are likely due to his perception that his memory processes are poor. This occurs often with

those suffering from depression. His performance on the IQ test reflects his lack of education, not necessarily his lack of ability. Most telling is his personality profile. He is depressed, anxious, and dependent. He is not motivated to change his behavior, even though he expressed discomfort.

Mr. Thompson would have no difficulty remembering and understanding instructions, procedures, and locations. However, it is likely he will continue to have problems interacting with others appropriately, using good judgement, or responding to change appropriately in the work place. These deficits are due to his personality functioning, not to his intellectual abilities. As this was not a neurological examination, it is difficult to rule out the nature of his seizure disorder and it's effect on his personality functioning.

Tr. at 545. The psychologist's diagnosis on Axis I was dysthymic disorder. On Axis II, the diagnosis was personality disorder not otherwise specified with dependent and schizoid features. Tr. at 546. The psychologist filled out a mental residual functional capacity assessment form. The following domains were rated "poor": relate to co-workers; deal with public; use judgment; interact with supervisors; deal with work stress; behave in an emotionally stable manner; and, relate predictably in social situations. Tr. at 548.

On January 13, 1999, Dr. Elmendorf wrote that Plaintiff's major problem is that of chronic pain due to an unstable back. Dr. Elmendorf stated that Plaintiff is unable to do heavy lifting. It was also Dr. Elmendorf's opinion that the years of chronic pain has lead to chronic depression. Tr. at 559.

## ADMINISTRATIVE HEARING

Plaintiff appeared at a hearing on January 26, 1999. Tr. at 81–123. Plaintiff was 37 years old at the time of the hearing.

Tr. at 84. Plaintiff testified to the problems he has with seizures. Tr. at 87–91. Plaintiff said that he takes 200 mg of Tegratol five times a day to control the seizures. Tr. at 88. He said that he has symptoms of the seizures two or three times a day and that the symptoms can last from a few minutes to an hour. He said that he becomes disoriented and forgets where he's at. Tr. at 89. Plaintiff said that stress seems to cause the seizures. Tr. at 90. Plaintiff also said that he has migraine headaches which last from 20 minutes to all day. Tr. at 91–92.

Responding to questions about his back problem, Plaintiff said that if he sits or stands for 15 or 20 minutes, he gets burning sensations and sharp pain in his back. Tr. at 98. To avoid the pain, Plaintiff said he needs to alternate his position every 15 to 20 minutes. Tr. at 99. Plaintiff said that because of the injuries to his hands, he does not have the grip that he used to have. He said the ends of his fingers are tender and that the skin splits open and becomes sore. Tr. at 101.

Plaintiff was asked about his mental problems. Tr. at 105. Plaintiff gave several examples of losing jobs because of his inability to get along with supervisors or co-workers. Tr. at 106–09. Plaintiff said that he had never been fired or quit because of use of alcohol. The ALJ asked Plaintiff why he had such a sporadic work history to which he responded that he would get a job and either his physical or mental problems would flair up and he would be fired. Tr. at 111. The ALJ asked Plaintiff if he had looked for work since he moved to Iowa and he said that he had not. Tr. at 112.

After Plaintiff testified, the ALJ called Carma Mitchell to testify as a vocational expert. Tr. at 117. The ALJ asked the following hypothetical:

For purposes of hypothetical number one, let's consider a 37-year-old, with an eighth-grade education, the most comprehensive residual functional capacity assessment is found at Exhibit 85 (Tr. at 529–40), from Dr. Hughes. It was his opinion, after his examination, that the claimant could continuously lift up to 20 pounds, continuously carry up to 20 pounds and he would be able to sit, stand and walk eight hours in an eight-hour day, every two hours taking the usual breaks. He based that on a normal clinical assessment. He found that the claimant's significant problems revolve around the use of his hands. He is restricted in simple grasping and fine manipulation in both his right and left hand, due to losing the tips of his third and fourth finger. However, despite the limitation, Dr. Hughes indicated that he could do simple grasping and fine manipulation from one-third to two-thirds of the time in an eight-hour day. Exhibit 85, page 10. He also indicated that he had the ability to climb, balance, stoop, crouch, kneel and crawl continuously, that he can handle and feel frequently, but not continuously, but he can continuously reach, push-pull, hear and speak. He bases the limitation as to feeling, pushing and pulling, on the finger amputation on the right and the mobility defects on the left. He felt that the claimant had no restrictions environmentally. In terms of the claimant's psychological problems, he was diagnosed with a dysthymic disorder and a personality disorder. Extensive testing was accomplished in September, October and November of '98, and the conclusions showed a full-scale IQ score of 76, despite his limited education, a verbal IQ score of 81, and performance IQ score of 74. These are found at Exhibit 86 (Tr. at 541–49). It was demonstrated that he had no impairments in memory and concentration. No difficulty in remembering and understanding instructions, procedures and locations. However, it was determined that he would have some problems interacting with others, using good judgment or responding to change appropriately, in the workplace, and these deficits were attributable to his personality, not his intellectual ability. With these restrictions, he would probably be limited to entry-level unskilled work activities, not requiring frequent interactions with the public. In terms of his seizure disorder, it would appear that he should avoid working on heights and ladders and around moving machinery. His headaches do not appear to be of such significant problems, whereas they would not be—whereas they could be controlled with the proper medications. With those restrictions, would he be able to perform any of his past work activity? Tr. at 17–19. In response, the vocational expert testified that Plaintiff would be unable to do his past relevant work but that there would be unskilled light work that such restrictions would allow. Tr. at 119. Examples of jobs were inserting machine operator, vending machine attendant, and housekeeping/cleaner. Tr. at 120.

Plaintiff's lawyer asked the vocational expert to consider a person with seriously limited, but not precluded, ability to relate to co-workers, deal with the public, use independent judgment, interact with supervisors, deal with work stresses, behave in an emotionally stable manner, or relate predictably in social situations. Tr. at 121. In response, the vocational expert testified that such a person would not be able to do competitive work activity. Tr. at 122.

## ALJ'S SECOND DECISION

Following the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since he filed

his application. The ALJ found that Plaintiff's severe impairments are multiple fingertip amputations on the right and mobility defects on the left; borderline intellectual functioning; personality disorder; dysthymia; and a seizure disorder with headache complaints. The ALJ found that none of these impairments meet or equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. Tr. at 42. At the Fourth step, the ALJ found that Plaintiff is unable to do his past relevant work. At the fifth step, the ALJ found that Plaintiff is able to do the types of work identified by the vocational expert in response to the first hypothetical question. The ALJ found that Plaintiff was not disabled nor was he entitled to the benefits for which he had applied. Tr. at 43.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

■ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

■ The ALJ found that Plaintiff is unable to do his past relevant work. The burden of proof, therefore, shifted to the Commissioner to prove with medical evidence that Plaintiff has a residual functional capacity to perform other work and that other work exists in significant numbers in the national economy that the claimant can perform. *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000) citing *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982)(en banc), and *O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir. 1983). *See also Cunningham v. Apfel,* 222 F.3d 496, 503 (8th Cir.2000), citing *Nevland.*

In *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir.2001), the Court wrote that although the ALJ was not limited to considering medical evidence to arrive at a finding of residual functional capacity, "we believe that the ALJ was required to consider at least some supporting evidence from a professional. *Cf. Ford v. Secretary of Health and Human Services,* 662 F.Supp. 954 (W.D.Ark.1987)."

When making the finding of Plaintiff's physical residual functional capacity, the ALJ relied heavily on the opinion of Dr. Hughes. This was entirely appropriate. Dr. Hughes wrote an extensive report. Dr. Hughes reviewed Plaintiff's medical history in great detail. Dr. Hughes performed a physical examination. Furthermore, Dr. Hughes' opinion regarding Plaintiff's residual functional capacity is consistent with the treating source opinion throughout this record. If Plaintiff's severe impairments were only the complaints

of back pain, and the injuries to his arm and hands, the Court has no doubt that this case would not be before it. Furthermore, there is no medical evidence to support a finding that Plaintiff is more limited by his seizure disorder than found by the ALJ.

Plaintiff, however, is not limited solely by physical impairments. The ALJ found that Plaintiff's severe impairments include a chronic depression diagnosed as a dysthymic disorder, and a personality disorder as well as borderline intellectual capacity. Dr. Hughes, upon whom the ALJ placed great weight, wrote that the most problematic feature of Plaintiff's situation is his "very limited intelligence and his very limited capacity for coping." Many of the doctors have commented on Plaintiff's limited insight into the nature of his illnesses. As Dr. Hughes points out: "He seems to take a great deal of solace in having illnesses and medical problems which preclude him from working ..." In other words, because Plaintiff does not understand the nature of his mental problems, he points to his physical problems as the reason he cannot work.

How do Plaintiff's mental problems impact on his ability to work? The record contains the opinion of the treating psychiatrist, Dr. Chang, Dr. Lonning's psychological evaluation dated February 22, 1994, and the report of Dr. Payne who saw Plaintiff over a period of three sessions in 1998. All of these sources are in agreement regarding the severity of Plaintiff's psychological problems. Furthermore, the doctors who reviewed the records for Disability Determination Services found that Plaintiff is limited in many, if not all of, the domains found by the treating and examining doctors. See Tr. at 253–54. All of these doctors opined that Plaintiff is seriously limited in several domains related to his ability to work. Health professionals, particularly psychiatrists and psychologists, not judges or lawyers, are the experts on mental illness. *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995). Many of Plaintiff's limitations are attributable to his personality disorder. Personality disorders, however, can be as disabling as other mental impairments. In *Tennant v. Schweiker*, 682 F.2d 707, 709 (8th Cir. 1982), the Court wrote: "The regulatory scheme contemplates that claimants suffering from disabling personality disorders may be entitled to Social Security Benefits."

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a vocational expert must be in response to a hypothetical question which captures the concrete consequences of the claimant's deficiencies. *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir.2001). In the case at bar, the ALJ accurately detailed Plaintiff's physical limitations when questioning the vocational expert. His physical limitations, however, are not the reason Plaintiff is unable to work. When the vocational expert considered the concrete consequences of Plaintiff's mental impairments which were articulated by the uncontradicted opinion of the most recent psychologist who tested Plaintiff, it was the vocational expert's testimony that no work is possible. According to the arguments made after the ALJ issued her first decision, the testimony of the vocational expert was the same when the limitations noted by Dr. Chang were considered.

In *Rhines v. Harris*, 634 F.2d 1076, 1079 (8th Cir.1980), the Court wrote: "Employers are concerned with substantial capacity, psychological stability, and steady attendance." The Court in *Rhines* went on to state: "The Secretary need not find a specific job for a claimant. However, it must be shown that claimant can realistically perform in existing employment."

As in *Rhines,* the Commissioner has failed to make the requisite showing in this case.

Because substantial evidence supports a finding that Plaintiff is unable to function in competitive employment, a remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. In such circumstances, a reversal with an award of benefits is the appropriate remedy. *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987).

### CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D.Ark.1987). A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is entitled.

Defendant's motion to affirm the Commissioner's final decision is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999), and LR 54.2(b).

IT IS SO ORDERED.